## CHARLES ORCHARDSON

*v.*

## AMELIA T. COFIELD *et al.*

*Opinion filed December 22, 1897—Rehearing denied February 2, 1898.*

1. WILLS—*when ability to transact ordinary business is not evidence of testamentary capacity.* The ability to transact ordinary business and to understand the business in which one is engaged when making a will is evidence of testamentary capacity, unless the testator was affected with some insane delusion which influenced his action.

2. SAME—*a will resulting from an insane delusion cannot be sustained.* A will cannot be sustained which is the direct result of an insane delusion of the testator in regard to the person who is the object of his bounty, or in regard to his moral duty to make the will in favor of a particular individual, corporation or society.

3. SAME—*belief in spiritualism as affecting testamentary capacity—insane delusions.* Belief in spiritualism is not proof of insanity or want of testamentary capacity, but where, through that belief, one is led into the delusion that another is a divinity or gifted with supernatural powers, the believer is insane on that subject, and a will prompted by that delusion cannot be sustained. (*Whipple v. Eddy*, 161 Ill. 114, distinguished.)

4. SAME—*evidence held sufficient to sustain charge of undue influence and want of testamentary capacity.* The court reviews at length the evidence and sustains the verdict of the jury setting aside the will in this contest, and holds that the evidence sustains the allegations of the bill that the will was the result of an insane delusion and was procured by undue influence.

5. MARRIAGE—*the marriage of an insane person is void.* The marriage of an insane person is void, and, not being good for any legal purpose, its invalidity may be shown in any court, between any parties, either during the lifetime of the parties to such marriage or after their death.

6. SAME—*marriage ceremony alone does not establish the relation of husband and wife.* A mere marriage ceremony does not make a man and woman husband and wife. Capacity and consent are absolutely essential, but celebration only contingently so.

7. SAME—*test for determining whether a person had sufficient mental capacity to enter marriage relation.* The most approved test for determining whether a person had sufficient mental capacity to enter the marriage relation is whether his mind could and did act rationally regarding the precise thing in contemplation,—marriage; not whether his conduct was wise, but whether it proceeded from a mind sane with respect to the thing done.

8. SAME—*action of chancellor in annulling marriage of woman after her death is sustained.* The court reviews the evidence in the case at length, and holds it sufficient to sustain the action of the chancellor in annulling the marriage of a woman after her death, upon the ground that she was insane when the marriage ceremony was performed and so remained until her death.

9. SPECIAL FINDINGS—*when special findings in a will contest are not inconsistent with a general verdict.* Special findings in a will contest that the testatrix possessed sufficient mental capacity to transact ordinary business, and to understand the business in which she was engaged when making her will, are not inconsistent with a general verdict finding that the will was not the last will and testament of the testatrix, as the conditions, as found specially, may exist and yet the testatrix not possess testamentary capacity, owing to the presence of an insane delusion.

APPEAL from the Circuit Court of Adams county; the Hon. OSCAR P. BONNEY, Judge, presiding.

JOHN H. WILLIAMS, and JESSE B. BARTON, for appellant:

Decedent was not an insane person, in the purview of the statutes, at the time of her marriage with appellant, and was therefore not incapable of contracting a marriage. *Whipple* v. *Eddy*, 161 Ill. 114; *Taylor* v. *Pegram*, 151 id. 106; *Burt* v. *Quisenberry*, 132 id. 385; *Halbert's Will*, 37 N. Y. Sup. 757; *Smith's Will*, 52 Wis. 543; *Brown* v. *Ward*, 53 Md. 376; *Guild* v. *Warne*, 149 Ill. 105.

A marriage voidable only cannot be avoided after the death of either party. Schouler on Domestic Relations, 24; *Bonham* v. *Badgley*, 2 Gilm. 622.

Undue influence to avoid an act or nullify a will must be a wrongful influence, and must have the effect of completely subjugating the mind of the actor or testator, so that he or she was incapable of withstanding it or of acting independently of it. *William's Will*, 15 N. Y. Sup. 828; 1 Bishop on Mar., Div. & Sep. secs. 595-601; *Kern* v. *Kern*, 51 N. J. Eq. 574; *Hill* v. *Barnes*, 158 Ill. 314; *Massey* v. *Huntington*, 118 id. 80; *Guild* v. *Hall*, 127 id. 523; *Bevelot* v. *Lestrade*, 153 id. 625; *Wilbur* v. *Wilbur*, 129 id. 393; 138 id. 446; *Rutherford* v. *Morris*, 77 id. 412; *Pooler* v. *Cristman*, 145

id. 405; *Sturtevant* v. *Sturtevant,* 116 id. 340; *Dickie* v. *Carter,* 42 id. 379; *Yoe* v. *McCord,* 74 id. 44; *Kimball* v. *Cuddy,* 117 id. 213; *Mitchell* v. *Mitchell,* 43 Minn. 73; *Will of Snelling,* 136 N. Y. 515; *Mackall* v. *Mackall,* 135 U. S. 167; *Storey's Will,* 20 Ill. App. 183; *Salisbury* v. *Aldrich,* 118 Ill. 199; *Brown* v. *Mitchell,* 75 Tex. 9; *Carpenter* v. *Bailey,* 94 Cal. 406; *Sheldon's Will,* 16 N. Y. Sup. 454; *Schmidt* v. *Schmidt,* 47 Minn. 451.

JAMES N. SPRIGG, GOVERT & PAPE, and WILLIAM L. VANDEVENTER, for appellees:

The terms "insane person" and "lunatic" include every idiot, *non compos,* lunatic, insane or distracted person. Rev. Stat. chap. 131, sec. 1, clause 6.

No insane person or idiot shall be capable of contracting marriage.    Rev. Stat. chap. 89, sec. 2.

A void marriage is good for no legal purpose, and its invalidity may be shown in any court, between any parties, either in the lifetime of the parties thereto or after their death.    *Cartwright* v. *McGown,* 121 Ill. 396; *Gathings* v. *Williams,* 44 Am. Dec. 54; *Unity* v. *Inhabitants,* 76 Me. 419; *Bell* v. *Bennett,* 73 Ga. 784; 14 Am. & Eng. Ency. of Law, 487, *et seq.; Powell* v. *Powell,* 18 Kan. 371; *Rawdon* v. *Rawdon,* 28 Ala. 565; *Foster* v. *Means,* 1 Speers' Eq. 509; *Crum* v. *Morgan,* 3 Ired. Eq. 91; *Browning* v. *Reane,* 2 Phillm. 69; *Parker* v. *Parker,* 2 Lee, 582; *Ex parte Turing,* 1 V. & B. 140; *Waymire* v. *Jetmore,* 22 Ohio St. 271; *Harrod* v. *Harrod,* 1 K. & J. 4; *Clement* v. *Mattison,* 3 Rich. 93; *Jenkins* v. *Jenkins,* 2 Dana, 102; *Jacques* v. *Public Admr.* 1 Bradf. 499; *Middleborough* v. *Rochester,* 12 Mass. 363; *Wightman* v. *Wightman,* 4 Johns. Ch. 343; 4 Blackstone's Com. 458; *Ward* v. *Delaney,* 23 Miss. 410; *Keyes* v. *Keyes,* 22 N. H. 553; *Christy* v. *Clarke,* 45 Barb. 529; 1 Scribner on Dower, (2d ed.) pp. 123, 124; 1 Bishop on Mar., Div. & Sep. secs. 258, 548, 600, 622, 645.

One not competent to carry on ordinary transactions of life is not competent to contract marriage.    3 Wait's Actions and Defenses, 629; *Ward* v. *Delancy,* 23 Miss. 410; *Cole* v. *Cole,* 5 Sneed, 57; *In re Spencer,* 96 Cal. 488.

The performance of a simple marriage ceremony will not make a man and woman husband and wife. Capacity and consent are absolutely essential, but celebration only contingently so. 1 Bishop on Mar., Div. & Sep. secs. 327, 588, 645, and cases there cited; *Cartwright* v. *McGown*, 121 Ill. 397.

A mere belief in spiritualism, or other religious opinions, does not constitute monomania; but when, from such or any other cause, the mind assumes a chronic condition of delusion, which controls and dictates the conduct and subverts and sets aside the individual judgment, will and conscience, then the victim of such condition is a monomaniac, and unable to marry or make a will. Rice on Am. Probate Law & Pr. 224-227; *Boyd* v. *Eby*, 8 Watts, 6; *Ballatine* v. *Proudfoot*, 62 Wis. 217; *In re Dorman*, 5 Denio, 112; *McClary* v. *Stull*, 44 Neb. 175; Cassody on Wills, 478; Beach on Wills, sec. 102; *Frazer* v. *Jennison*, 42 Mich. 206; *Spratt* v. *Spratt*, 76 id. 384; *Rice* v. *Rice*, 50 id. 448; *Smith* v. *James*, 72 Iowa, 515; *Lee* v. *Scudder*, 31 N. J. Eq. 633; *Middleditch* v. *Williams*, 45 id. 726; 1 Redfield on Wills, 90; *Potter* v. *Jones*, 20 Ore. 239; 1 Wharton & Stille on Med. Jur. 65; Taylor on Med. Jur. 638; 1 Bishop on Mar., Div. & Sep. secs. 591, 592.

Issues tried by the chancellor and a jury are issues of fact, and particularly within the province of the trial court. The evidence was irreconcilable and sharply contradictory, and the findings must be taken as conclusive. *Bible Society* v. *Price*, 115 Ill. 643; *Insurance Co.* v. *Cotton Co.* 24 Ill. App. 149; *Claybaugh* v. *Hennessy*, 21 id. 124; *Field* v. *Railroad Co.* 71 Ill. 458; *Barrows* v. *Barrows*, 138 id. 649; *Voss* v. *Venn*, 132 id. 14; *Lane* v. *Lesser*, 135 id. 567; *Schoonmaker* v. *Plummer*, 139 id. 612; *Kusch* v. *Kusch*, 143 id. 353; *Batcheller* v. *Batcheller*, 144 id. 471; *Metcalf* v. *Bradshaw*, 145 id. 124; *Towle* v. *Wadsworth*, 147 id. 80; *Loncheim* v. *Seyforth*, 49 Ill. App. 561; *Hughey* v. *Hughey*, 48 id. 315; *O'Connor* v. *O'Connor*, 50 id. 469; *Ashmore* v. *Hawkins*, 145 Ill. 447.

171—2

Mr. JUSTICE WILKIN delivered the opinion of the court:

To the October term, 1894, of the circuit court of Adams county, appellees, two of the heirs of Minerva Orchardson, (or, as appellees insist, Minerva Merrick,) deceased, filed their bill in chancery against appellant and others, to contest the validity of the last will and testament of said Minerva upon the ground of mental incapacity, and that its execution was procured by the said Charles Orchardson through fraud and undue influence, and also to set aside and have declared null and void a marriage which appellant, Orchardson, claimed existed between himself and the said Minerva at the date of her death, on the ground of her mental incapacity to enter into a marriage contract at the time of the alleged marriage, and the fraud of said Orchardson. The defendants, except Orchardson and one William H. Boyd, were also heirs of the testatrix. Orchardson alone answered the bill, and he denied each of its material allegations. Replication being duly filed, the trial and hearing below were upon the issue thus formed. On that branch of the case involving the validity of the will an issue at law was made up whether the writing produced was the will of the testatrix or not, and tried by a jury, resulting in a verdict that it was not. The court also submitted to the jury certain interrogatories for special findings, which they returned with a general verdict, as follows:

*First*—"Did Minerva Merrick Orchardson, at the time said will purports to have been signed, possess sufficient mental capacity to transact ordinary business?"—Yes.

*Second*—"Did said Minerva Merrick Orchardson, at the time said will was signed by her, (if it was so signed,) have sufficient mental capacity to know and understand the business in which she was then engaged?"—Yes.

*Third*—"Was there any undue influence exercised over Minerva Merrick Orchardson, connected with or operating upon her at the time she executed the will in question, if she did execute it?"—Yes.

A motion for new trial was overruled and a decree entered upon the general verdict, setting aside the will and probate thereof. By agreement of the parties the issue as to the validity of the marriage was submitted to the chancellor on the same evidence produced before the jury, with such additional testimony as either party saw fit to introduce, and that issue was also found for the complainant, and a decree entered that the "alleged marriage of Minerva Merrick to the said Charles Orchardson, of date April 9, 1893, was, and remained at and from the time thereof, and is, null and void." From both these decrees Orchardson has prosecuted this appeal.

Several errors are assigned upon the record, but the only grounds of reversal insisted upon are, that the evidence is insufficient to authorize either decree, and that on the issue as to the will the special findings of the jury are conclusive.

The facts found by the chancellor material to a consideration of the first position are as follows: That Minerva Merrick, at the time of her alleged marriage with Charles Orchardson of date April 12, 1893, was of age about eighty-three years; that she had been for several years afflicted with cancer, and her physical health had become poor; that her mind and memory had become greatly weakened and impaired; that she had been a widow since 1876, and lived in her own home, with her servants, in Quincy, Illinois; that she was possessed of a considerable fortune; that from a time shortly after her husband's death, in 1876, she had believed in what was commonly known as "spiritualism," and her views concerning spiritualism had grown upon her in later years, and she had been for some time last preceding her alleged marriage to Charles Orchardson, and was at the time of such alleged marriage, and remained continuously thereafter until her death, on June 11, 1894, a monomaniac on the subject of spiritualism, and insane upon all matters into which the subject of spiritualism entered or which were connected therewith, and

was, and remained during all that time, wholly dominated and controlled by insane delusions, among other things believing she could receive, and did receive, through the intervention of other persons as mediums—not claiming to be in any sense a medium herself—communications, advice and directions concerning the conduct of her affairs and business from disembodied spirits generally, and par-. ticularly from the spirit of her deceased husband, Dr. Marcus Merrick, and was and remained so controlled thereby and by such communications, advice and directions, and insanely believed it to be her religious and conscientious duty to obey such directions, without heeding the advice of her formerly trusted friends or her counsel, and without consulting or relying upon her own mind and will she followed, obeyed and acted upon such supposed spirit communications, advice and directions concerning any matter or matters, and in all matters requiring her attention and action during that time she first submitted, and considered it her duty to submit, to the same, through medium or mediums, for the advice and direction of such supposed spirits as to what her actions should be as to such supposed advice which had been received by her; that preceding said alleged marriage, and during the month of October, 1892, the said Charles Orchardson, then about the age of fifty-seven years,—a person substantially without means or property, and a stranger to Mrs. Merrick and to the community in which she lived in Quincy,—appeared in Quincy, and within a few days of his arrival inquired for Mrs. Merrick's place of residence, and evinced a knowledge that she was a spiritualist and the wealthy widow of Dr. Marcus Merrick, deceased; that the said Orchardson was then a married man, having a wife living in the State of Michigan, and who, some two months thereafter, procured a divorce from the said Charles Orchardson on account of cruelty; that the said Minerva Merrick was informed of these facts concerning said Charles Orchardson, and also informed that such application had been

made also upon the charge that said Orchardson had consorted with a woman notoriously lewd, which woman came with said Orchardson to Quincy, Illinois, and that said information came to said Minerva Merrick some time preceding her alleged marriage to him, and at said time she was also informed that he had consorted in a lewd manner with women after coming to Quincy, and during the time, as hereafter mentioned, in which he was engaged in writing a book at said Mrs. Merrick's house, and said Minerva Merrick admitted and believed said information to be true; that, beginning within a few days after he, the said Orchardson, so first came to Quincy, he made the acquaintance of said Minerva Merrick, and from that time until the alleged marriage spent much of his time at her house; that he had with him, and said Minerva Merrick read, a number of what he falsely and fraudulently alleged to be the writings from the spirits of persons distinguished in history and long since dead, which writings he falsely and fraudulently professed to have seen written in a miraculous manner without human hands; that in these supposed communicatious the said Orchardson professed to be directly addressed by the spirits as "The Son of Wisdom" and by other laudatory titles; that they purported to speak at considerable length in exalted terms of the powers of the person addressed, defining them as like unto those of Jesus Christ, referring to said Orchardson as destined to be the saviour of the human race and as commissioned by the spirits to reform and regenerate mankind; that they also indicated that these communications, and other phenomena supposed to be in the possession of the said Orchardson of like character, should be prepared and published as a book, the sales of which should net a very large sum of money; that some of them referred to the want of means on the part of said Orchardson to carry out the supposed commission, and intimated that this want should be supplied and that he should persevere; that said Orchardson also referred in credulous terms to his confidence

in the statement that he had been on the planet some centuries prior to his present nativity, to the fact that many most important communications from the spirit world had come to him directly without the intervention of any other medium, and under conditions which he stated as, from his personal knowledge, they could not possibly be untrue or unreal; that within a few days after the said Orchardson commenced to visit at said Mrs. Merrick's house he commenced to write the said book, and wrote the same at her house, spending most of his time there, and finished the book, and had it printed and issued from the bindery, at Mrs. Merrick's expense, a few days before the alleged marriage, the book being entitled, "The Light of the Ages, and Death Blow to Poverty;" that it was by dedication addressed to Mrs. Merrick, contained numerous flattering references to her, represented that his opinion and hers on the subject treated were in accord; also represented that Mrs. Merrick had become the financial support of the book, and of Orchardson in carrying out the commission referred to in the spirit writing; that a considerable part of the book was occupied with a reproduction of the said supposed spirit communications, and a recital of extravagant spirit phenomena supposed to have come within said Orchardson's personal observation and experience; that the said Minerva Merrick was informed of the contents of said book and the matters above referred to, and by reason of her said weakness and delusion of mind and monomania, and the false and fraudulent representations of said Charles Orchardson, believed the same implicitly to be true, and believed the said Orchardson to possess the attributes and to be charged with the commissions referred to in the alleged spirit writings, and that in so believing she refused to consider the advice and caution of her formerly trusted friends and counsel or to be influenced by her own mind and will, and was in that respect controlled wholly by her said weakness and insane delusions of mind, and was not possessed of sufficient mental capacity to

free her mind from that belief and delusion; that the said pretenses and representations by the said Charles Orchardson were made by him falsely, and with a design and purpose by fraud and falsehood to obtain the confidence of the said Minerva Merrick, to obtain control of her person and bring about the alleged marriage, and with a fraudulent scheme and purpose of obtaining her property; that a short time prior to the time when said alleged marriage occurred, the said Charles Orchardson, together with one William H. Boyer, who also claimed to be a spirit medium, knowing of the aforesaid weakness and insane delusion of mind of said Minerva Merrick, and by further fraud, artifice and deceit, and in furtherance of said scheme and the design of said Charles Orchardson, and with intent to defraud and entrap the said Minerva Merrick into the relation and state of marriage with the said Charles Orchardson, falsely and fraudulently caused the said Minerva Merrick to believe, through the medium of the said William H. Boyer, that he, the said Boyer, was in communication with the spirit of her said deceased husband, Dr. Marcus Merrick, and that it was the will and direction of her said deceased husband, who was represented to be then and there present and addressing her, that she should marry said Charles Orchardson; that the said Minerva Merrick, then insanely believing such communications and directions to come from her said deceased husband, and that he was then so present as represented, and that it was her duty to obey his said supposed directions, and then laboring under her aforesaid weakness and insane delusion of mind, and without the intervention and exercise of her own mind and will, and without having sufficient mental capacity to disenthrall herself from said belief and delusion, and by means aforesaid and not otherwise, shortly thereafter was procured by the said Charles Orchardson, and through his said falsehood and fraud, to submit with him to a ceremony of marriage, and did submit to such form and ceremony of marriage; that the said al-

leged marriage ceremony was procured and brought about wholly by the fraud, artifice, imposition and deceit of the said Charles Orchardson, acting in person and through others, practiced upon her while she was in the condition of mind aforesaid; that the said Minerva Merrick, at the time of said marriage, was, and from the time of said marriage down to her death remained, enthralled, dominated and controlled by the said weakness and insane delusions on her part and by her belief in said pretended spiritualistic communications, directions and representations, and by the fraud of the said Charles Orchardson, and by her said belief and insane delusions that it was and continued the wish and direction of her said deceased husband that she should become and remain the wife of the said Charles Orchardson, and that it was her duty so to do; that there was no time, at or after said marriage, when she was released from said insane delusions and weakness of mind, or was able to exercise her own mind, will or judgment in regard to said marriage, or knew or realized in her own mind the fraud so practiced upon her, or when she was possessed of the mental capacity to ratify or consent to said alleged marriage, or to consider, in and by the exercise of her own mind and will, the situation in which she had been placed or which she occupied by reason of the said pretended marriage and the aforesaid fraudulent representations and conduct of the said Charles Orchardson; that said alleged marriage was never consummated by coition between the parties thereto as husband and wife, and that it was never consented to or ratified by the free will and consent of the said Minerva Merrick; that no issue was born of said alleged marriage; that said Minerva Merrick did not, at the time of said marriage or thereafter, discover said fraud so practiced upon her by said Orchardson or said Boyer, and did not, at any time after said marriage, possess sufficient mental capacity to either ratify or disaffirm said marriage or to assume the relation of wife to said Charles Orchardson.

Concerning the mental condition of the said Minerva Merrick, the court found, from the evidence, that for a number of years last preceding her said alleged marriage to Charles Orchardson she had, in numerous instances, invested large sums of money unprofitably, wastefully and irrationally, wholly at the dictation of what she supposed to be disembodied spirits, deeming it to be her duty to do so, and without the exercise of her own mind and will in so doing; that she had also, at times, under the advice of the so-called spirits, been greatly suspicious and troubled concerning her business matters where no ground of suspicion existed, and where to a rational mind the security of her business, in the matters about which she was so suspicious, would have been readily perceived, and in such matters she was incapable of receiving rational advice and acting thereon, and her suspicion could only be allayed by following the course mapped out by the spirits, and then at a wholly unnecessary cost and waste of her property, to which cost and waste she readily yielded, and without sufficient mind to realize the imposition to which she had been subjected; that she had, during all her life, been a woman of chaste and pure thought and morals, but, owing to the domination and influence of her said mental delusions and her infatuation therewith, she had, at the time of said alleged marriage, become an apologist for the debauchery of others and insensible to the immoral contamination surrounding her, and from that time to her death she so acted as to belie the purity and womanhood of her former life; that during the many years of her widowhood, and down to a very short time preceding the said alleged marriage, she often expressed her aversion to a second marriage, and had steadily adhered thereto until the pretended message from her departed husband came, as she believed, when, under the irresistible influences of her insane delusions, and particularly under the belief and delusion that her husband had so directed and that it was her duty to obey

such directions and to disregard her own inclination, will and judgment, and under the delusion that alleged spirits had commissioned the said Charles Orchardson as aforesaid, and that he was possessed of the powers and functions aforesaid by and through such spirits, and that she was assisting him therein, she was taken possession of, dominated and controlled by said delusions and beliefs and wholly unable to exercise her own judgment, and took part in and became party to said alleged marriage, and in doing so believed and felt, concerning said Charles Orchardson, that she had found one who espoused the doctrines so near to her heart, and who would revolutionize the world and eliminate the misery and sorrows from the conditions of men; that said Minerva Merrick was at the time of the said alleged marriage, and from that time continuously down to the time of her death remained, insane upon the subject of spiritualism, and that insane delusions arising from her monomania were, and continued during all that time, officious, operative, controlling and influential in producing an insane consent to the said alleged marriage, and that but for such insane delusions she would never have married the defendant, Orchardson, or have continued thereafter during her life to be known as his wife, and that by reason of such insane delusions she was not, at or at any time after the said marriage, of sufficiently sound mind to consent to become or be the wife of the said Charles Orchardson, and that the alleged marriage of Minerva Merrick and said Charles Orchardson was, and remained until the death of the said Minerva Merrick, null and void.

The will·was executed February 3, 1894,—about ten months after the marriage. It gives to the defendant George H. Turner $3000, and to Minerva Merrick Sales, a grand-niece, another of the defendants, $2000. All the remainder of her estate, real and personal, she willed to Charles Orchardson, and appointed him executor of the will without bond. She died June 11, 1894.

The contention that the special verdicts of the jury on the issues submitted to it should be held conclusive as to the validity of the will could only be sustained upon the ground that they are so inconsistent with the general verdict that the latter cannot stand. The testatrix may have "possessed sufficient mental capacity to transact ordinary business" and at the time she signed the will "had sufficient mental capacity to know and understand the business in which she was engaged," and still, under the issues in this case, have been wholly incapable of making a will. Complainants do not allege in their bill, nor is it the theory of their case, that she was insane or of unsound mind generally, but that she was the victim of an insane delusion, under which she labored at the time she made the will. Capacity to transact ordinary business, and to know and understand the business in which one is engaged at the time of making a will, are evidence of testamentary capacity, unless the testator was at that time affected with some morbid delusion which influenced his action. (*American Bible Society* v. *Price*, 115 Ill. 623, and authorities there cited.) The question here is, was her natural "mental capacity" exercised in the making of her will, or was she at the time influenced and controlled by the alleged insane delusion? The special findings of the jury were not, therefore, irreconcilable with the general verdict. The question on this branch of the case then is, Does the evidence sustain the general verdict of the jury?—and, first, was the testatrix the victim of an insane delusion to the extent of destroying her testamentary capacity when influenced or controlled by that delusion; and second, was she so influenced in making this will.

We said in *American Bible Society* v. *Price, supra*, (p. 638): "Beyond all question it is within the previous rulings of this court, and abundantly sustained by the rulings of other courts of the highest respectability, that where there is insane delusion in regard to one who is an object of the testator's bounty, which causes him to make a will

which he would not have made but for that delusion, such will cannot be sustained. And so also where there is insane delusion in regard to the duty or moral obligation of a party to make a will in favor of a particular individual, corporation or society, and a will is made as the result of that insane delusion, it cannot be sustained.— 1 Redfield on Wills, (3d ed.) 72, 74, *et seq.* and notes; 1 Jarman on Wills, (5th ed.) 38, *et seq.* and notes; Buswell on Insanity, secs. 13, 381."

The testimony in the record is so voluminous as to forbid an attempt to review it here. Much of it, on either side, is of very little or no relevancy to the issues in the case. Our examination of it, taken as a whole, has led us to the conclusion that it sustains, in substance, the findings of the chancellor as recited in the decree. It thus appears that Orchardson represented to Mrs. Merrick that he had, in certain communications from spirits, been addressed as "The Son of Wisdom," speaking of his powers as like unto those of Jesus Christ, and referring to him as destined to be the saviour of the human race and as commissioned by the spirits to reform and regenerate mankind; that it was indicated that these communications should be published in a book, the sales of which would yield large sums of money, etc.; that Orchardson shortly thereafter commenced to write such a book at her house, where he completed the same, and had it printed at her expense a few days before the marriage, and dedicated it to her; that the book contained numerous flattering references to her, representing that her opinions on the subject treated were in accord with those of Orchardson; that she had become the financial support of the book and of Orchardson in carrying out the commission referred to in the spirit writings, a considerable part of the book being occupied with a reproduction of the supposed spirit communications claimed to have been made to him; and the court found, from the evidence, that she was informed of the contents of said book and the matters referred to,

*"and by reason of her said weakness and delusion of mind and monomania, and the false and fraudulent representations of said Charles Orchardson, believed the same implicitly to be true, and believed the said Charles Orchardson to possess the attributes and to be charged with the commission referred to in the alleged spirit writings."*

From these recitals of facts, as well as from a careful reading of the testimony, we are forced to the conclusion that from a time prior to the marriage to the making of the will, and until her death, Mrs. Merrick was the victim of a morbid and insane delusion as to the character, powers and mission of Orchardson, believing him to be possessed with superhuman attributes and powers and charged with a commission beyond that committed to ordinary men, and that in making him the principal recipient of her bounty she was influenced by that delusion. There is not in this voluminous record a particle of proof that she entertained for him the remotest sentiment of affection, gratitude or admiration, except as she was controlled by the delusion that he was more than a mere man, and that he was under the influence of spirits commissioned to do and perform superhuman acts. He was in no rational sense the object of her bounty, nor can we believe from this evidence that she was influenced to so treat him except through the delusion referred to. The gift to him was not prompted by a desire or sense of duty to provide for him as man, but because she had been, by reason of her diseased mind and through the influence and desire of Orchardson, made to believe that he was more than a man,—gifted with superhuman faculties. She believed it her duty to bestow her property upon him because of her morbid, insane delusion as to him, and we repeat, as said in the *Price case*, it appearing that such insane delusion in regard to her duty or obligation to make the will in his favor was the result of that insane delusion, the will cannot be sustained. On this ground the general verdict was warranted by the testimony.

In reaching·this conclusion we do not hold that a mere belief in spiritualism is proof of insanity. A charge of general insanity is not supported by proof of mere belief on questions of opinion, however absurd; but when, as here shown, an act was done under the promptings of an insane delusion, and the proof shows that it was the result of belief in facts the existence of which no rational person would believe, insanity is proved. Belief in spiritualism is not proof of insanity, but if, through that belief, one is led into the delusion that another is a god,— a Christ,—or gifted with powers and faculties belonging only to supernatural persons, the believer of the delusion is insane on that subject, ·and if he is prompted to make a will by that delusion his will cannot be sustained.

Counsel for appellant cite and reply upon *Whipple* v. *Eddy,* 161 Ill. 114, as an authority sustaining the validity of this will. The contestant in that case was the adopted daughter and sole legatee of the intestate. She sought to have the will set aside so that she might come into immediate possession of the estate, instead of being prevented from doing so until she reached a certain age, as provided by the will. There was nothing in the bill or proof in that case to the effect that the testator was influenced, in making his will, by a belief in spiritualism or any other delusion. The charge was that he was insane, and it was shown he had been a believer in spiritualism and had been influenced by that belief to do many irrational things, but there was an absolute absence of testimony to the effect, or even tending in the slightest degree to show, that he was prompted to make his will by his belief in spiritualism. What we there said as to the effect of belief in spiritual influences, etc., was thought to be applicable to the issues and facts of that case, but the statement in the opinion, "the record is barren of proof even tending to show that the subject of spiritualism ever entered his mind in connection with his will," sufficiently distinguishes that case from this.

We also think the verdict of the jury is abundantly sustained on the ground of undue influence. The third special interrogatory propounded to the jury was answered in the affirmative,—that is, that there was undue influence exercised over the testatrix connected with or operating upon her at the time she executed the will. That appellant sought out Mrs. Merrick at her home in Quincy and took advantage of her extreme views on the subject of spiritualism with the design and for the purpose of obtaining her property is morally certain. That he obtained complete mastery over her will is equally certain. He procured the will to be written, and while it is claimed he acted under her directions, we are satisfied that the directions were of his own procurement. There is every reason for believing, from the evidence, that he brought about its execution in privacy himself, selecting and procuring the attendance of witnesses in whom he could confide. He it was who prompted her, when the witnesses and parties selected to be present had assembled in her room, to declare that the paper was her will. While there was no little skill and ingenuity displayed by him in concealing the fact, we cannot doubt that he was the real, active, moving agency in having the will executed, and that she was induced to make it through his influence and procurement. Certainly there was sufficient evidence of that fact to justify the special finding of the jury that there was undue influence. We do not overlook the fact that it is not every influence exercised over a testator or testatrix by the beneficiary under a will which will justify a decree setting it aside; but when the relative positions of these parties are considered, she being an aged and feeble woman, laboring under the influences of an insane delusion brought upon her through his machinations, the rule can have no proper application.

The verdict of the jury that the alleged will was not the last will and testament of the testatrix was, we think, fully authorized by the testimony on both grounds alleged.

On the issue as to whether the marriage between Mrs. Merrick and Charles Orchardson was void because of her want of mental capacity to enter into the marital relation, we think the court below decided correctly. Section 2 of chapter 89 of our statutes provides: "No insane person or idiot shall be capable of contracting marriage." Clause 6, section 1, chapter 131, says: "The words 'insane person' and 'lunatic' shall include every idiot, *non compos,* lunatic, insane or distracted person." These provisions are but declaratory of the common law. (1 Bishop on Marriage and Divorce, par. 136; 1 Kent's Com. 76; *Jenkins* v. *Jenkins*, 2 Dana, 102; *Camp* v. *Morgan*, 3 Ired. Eq. 91.) In the latter case it was said: "We have no doubt that by the common law of England, as far as can be traced for four or five centuries, a marriage of a lunatic is void, and must be pronounced so by every court to each and every form in which the subject can be presented." And we said in *Cartwright* v. *McGown*, 121 Ill. 388: "A void marriage is good for no legal purpose, and its invalidity may be shown in any court, between any parties, either in the lifetime of the parties thereto or after their death." Also: "A simple marriage ceremony will not make a man and woman husband and wife. Capacity and consent are absolutely essential, but celebration only contingently so."

It is clear, from all the evidence, that the mental condition of Mrs. Merrick did not materially change after the marriage,—certainly not for the better,—and, therefore, if void when entered into, the marriage continued so to her death, and her heirs may have it annulled. The controlling question, therefore, now is, was she mentally capable of entering into the marriage relation on April 12, 1893,—the date of the marriage?

It is impossible to prescribe a definite rule by which the mental condition as to sanity or insanity can in every case be tested. That laid down by Mr. Bishop in his work on Marriage, Divorce and Separation (vol. 1, sec. 600,) is generally approved. After referring to the decisions of

different courts on the subject he says (sec. 599): "Marriage is the legal band around affections assumed to be already united and the blending of two lives in one, and while it is in some degree of the head, it is primarily and chiefly of the heart. Hence, in reason the test question should be, whether or not the parties have the capacity of mind required for duly comprehending this union." He then states in the following section (600) the "true doctrine," as follows: "Assuming this to be the correct idea of the subject matter of the contract, none of the foregoing enunciations from the bench are precisely accurate, but the true view, in principle, is as follows: The mental incapacity which disqualifies one for crime is such as renders it impossible he should entertain the criminal intent. The disqualifying incapacity for making a deed, a will or a bill of sale of personal property is such as puts it out of the power of the person to exercise a *disposing mind in respect of the particular thing.*" The question here is not altogether of brain quantity or of brain quality in the abstract, but it is whether or not the mind could and did act rationally regarding the precise thing in contemplation,—marriage. In a marriage case the question is whether the alleged insane person acted rationally regarding marriage, and the particular marriage in dispute, —not, indeed, whether his conduct was wise, but whether it proceeded from a mind *sane as respects the thing done,* etc.

It would be hard to conceive of a more irrational act than that of Mrs. Merrick in becoming the wife of Charles Orchardson. She had reached an extreme old age; was afflicted with an incurable disease; was possessed of a comfortable home, and an abundance of money and property with which to satisfy her every want and taste. She had many attentive and devoted friends and neighbors, with whom she had been associated for years. Her tastes were refined and her moral sense unperverted, disapproving of immorality, intemperance and other like sins. She held in the highest esteem the memory of her

171—3

husband, who had been a man of superior character and intelligence. The uncontradicted evidence produced upon the trial before the jury, and upon which the decree of the chancellor voiding the marriage was based, shows that as to each of these ennobling characteristics and virtues in Mrs. Merrick Charles Orchardson was as completely her antithesis as it is possible for one person to be unlike another. Especially must his debaucheries and associations with lewd women have shocked her sense of virtue and morality, and repelled her from coming in contact with him, had she been in the exercise of her normal faculties. It is true that many strange and unnatural marriages are contracted and the sanity of the parties not questioned; but it is also true that when the question is raised it not infrequently appears that some insane delusion prompted one or the other of the parties in contracting such unnatural marriages. Certainly, in so extreme a case as this the mind naturally attributes the act to some unusual motive or influence, and we think it is found here both in Mrs. Merrick's belief in the superhuman powers and attributes of Orchardson, and the insane delusion that the spirit of her dead husband dictated and approved of the marriage. All the evidence shows that she never conceived the idea of assuming the relation and the duty of a wife by the marriage as ordinarily understood. Whether she should marry the man or adopt him as her son was a matter of indifference, her sole object and purpose being to place herself and her property in such relation to him that they might be used by him, through his extraordinary powers, in the accomplishment of his wonderful mission.

Counsel for appellant reiterate the proposition that the fact that a person believes in spiritualism, ghosts, dreams, etc., is not proof of his or her insanity, and cases are cited holding where general insanity is charged, and without proof that the belief led the believer into some insane delusion which prompted the act sought to be set

aside, the act was valid, however extreme or unreasonable the belief in spiritualism or other like beliefs. We have no criticisms to make upon those authorities. They are not in conflict with that other class of cases which hold that if a person labors under a mental delusion on a subject at the time of making a will or entering into a contract, and the will or agreement is the result of such delusion, then the will or contract is void, notwithstanding the person may have been sane on all other subjects. In *American Bible Society* v. *Price, supra,* the circuit court instructed the jury (p. 632): "If the jury believe, from the evidence, that although Isaac Foreman had sufficient capacity to attend to the ordinary business affairs of life, yet that with regard to subjects connected with the testamentary disposition and distribution of his property and the natural objects of his bounty he was insane, and that while laboring under such insanity he made the will in question, and that in making it he was so far influenced or controlled by such insanity as to be unable rationally to comprehend the nature and effect of the provisions of the will, and was thereby led to make the will as he did, then the jury must find the will not to be the will of the said Isaac Foreman. An insane delusion is a fixed and settled belief in facts not existing, which no rational person would believe. Such delusion may sometimes exist as to one or more subjects, and if the jury believe, from the evidence in this case, that Isaac Foreman was laboring under such insane delusions upon subjects connected with the testamentary disposition of his property and the natural objects of his bounty when he made the will in question, and was thereby rendered incompetent to comprehend rationally the nature and effect of the act, and that but for such delusions he would not have made the will as he did, then the jury should find against the validity of the will." And it was insisted, upon appeal to this court, that the giving of that instruction was error; but we held otherwise, and sustained the

ruling of the court below upon the ground that it announced the correct rule of law. It was also held in that case that the belief of the testator, Foreman, that by placing his property in religious institutions for charitable purposes it would continue to increase until the day of judgment,—to work for him,—was evidence of a morbid delusion sufficient to sustain the verdict of the jury holding his will to be invalid. It cannot be said that the law is different as to marriage or other contracts.

Judge Bonney, who heard the case below, in his able and elaborate written opinion filed with his decision on this branch of the case, after summing up the evidence tending to show that Mrs. Merrick was the victim of an insane delusion growing out of and resulting from her belief in spiritualism, said: "Numerous witnesses who knew her well,—who were her immediate neighbors and who saw her frequently,—declare her insane upon the subject of spiritualism; and to four physicians were put hypothetical questions, every element of which was abundantly proven by the testimony in the case, who gave the opinion, as experts, that she was insane. She built Merrick Hall at a place which rendered the construction of the building unusually expensive, because she was under the delusion that the spirit of her dead husband directed her to build it, and to build it at that particular place. She sent to Washington and brought hither an attorney to collect a claim against an estate perfectly solvent, and paid him the sum of $500 therefor, because she had been advised by the spirits, and was under the insane delusion that she was about to lose her money, or some of it, and it must be the Buckley money,—and this, too, when she had an attorney here who had attended to her business affairs for several years, and whom she had known much longer, and against whose honesty and integrity the finger of suspicion had never turned. So strong was the delusion, that she offered him $500 to collect the same moneys, and when he assured her that the claim was safe and re-

fused her exorbitant offering, instead of listening to his advice and the voice of reason she blindly followed the behests of her delusion, in the manner so characteristic with persons afflicted with this form of insanity, and brought the Washington lawyer to her aid.   The surrender of the mortgage to Clara Robinson, her dealings with Hainer,— both of whom were mediums,—evince her deranged condition whenever the circumstances offered an opportunity for her belief in spiritualism to become influential. Though highly moral, and absolutely pure in every thought and deed that sprang from her long life, through the influence of spiritualism she became an apologist for the debauchery of others and so acted as to belie every element of her purity and womanhood.   A radical change takes place in the very essentials of her character.   She had frequently expressed her aversion to a second marriage, and steadfastly adhered to her resolution until the pretended message from her husband came, and then, under the irresistible influence of her insane delusion, she assented, believing she had found one who espoused the doctrines so near to her heart, and who could revolutionize the world, eliminate misery and sorrow from the conditions of men, and, as it were, make earth a paradise."

It is also to be kept in mind that, in the view we have already expressed, the marriage in question was brought about and procured by Charles Orchardson in the accomplishment of his scheme and purpose to obtain possession of the property of Mrs. Merrick, and this fraud is to be taken into consideration in connection with the evidence of the mental incapacity of Mrs. Merrick at the time of the alleged marriage.   Bishop, in his work on Marriage, Divorce and Separation, (vol. 1, sec. 611,) says: "The intellect may be very weak,—not absolutely free from derangement,—while yet not to an extent disqualifying the person to contract matrimony, for the disorder or feebleness, to have this effect, must have reached a standard magnitude."   And he adds, in section 612: "The cases

oftenest occurring are where partial insanity or great weakness of intellect is circumvented by fraud. Such a case was the Earl of Portsmouth's, who, being of weak and somewhat disordered mind, was led by the artifice of his trustee and solicitor, whose influence over him was great, into a marriage with the latter's own daughter. The marriage was declared void. And in another case of the like nature, a man of forty contrived to bring about between himself and a woman of seventy,—a drunkard, with considerable property, which he sought to secure,— a marriage without a settlement, or the knowledge of her friends. It also was adjudged void." And again, in section 613: "The two ingredients of fraud and insanity, thus blending, often in matrimonial causes produce by their united action a nullity which neither could alone effect." *Lyndon* v. *Lyndon,* 69 Ill. 43, is in harmony with this principle.

In the case of the man of forty intermarrying with a woman of seventy referred to above, which is the case of *Browning* v. *Reane,* 2 Phillimore, 69, (1 Eng. Ecc. 190,) the evidence was to the effect that the woman was not only addicted to the excessive use of intoxicating liquors, but that she had been from childhood of very weak intellect. But the court does attach importance to the fact that the evidence disclosed that the marriage was procured by the man for the purpose of obtaining the estate of the woman, and in speaking of the weight to be given to the alleged fact of marriage it is said: From "merely pleading the fact of marriage the court could not expect much that was satisfactory. If the marriage was brought about by fraudulent confederacy there would be two descriptions of persons present at it—the parties confederating, and those whose presence was necessary and who might be deceived and imposed upon." This language, we think, is peculiarly applicable to the facts in this case as to the manner in which the empty ceremony of marriage was pretended to be celebrated.

In *Foster* v. *Means*, 1 Speers' Eq. 509, a marriage was held to be null and void between a man and woman on the ground of the mental incapacity of the man and the fraudulent procurement of the woman. In that case, as in the *Browning case, supra,* the mental defect was from childhood, and while there was some evidence to the effect that the man was capable of reasoning to a limited extent and comprehending some of the ordinary matters of life, the judgment avoiding the marriage was based upon the mental weakness, together with the undue influence exercised by the woman in the procurement of the marriage. In rendering the opinion the court says, after speaking of the mental infirmity: "I have no doubt but that the complainant availed herself of this imbecility of mind and the natural instincts which might prompt him to marry, either to induce him to propose marriage or to propose it herself, with the expectation of securing his property to herself. There could have been no other motive on her part to enter into such a contract with such a man." So, here, it appears beyond cavil that Charles Orchardson entertained for this deluded old lady no single sentiment of affection or esteem, which must prompt every honorable marriage, and that he married for her money, and nothing else. "There could have been no other motive on his part to enter into such a contract with such a woman." Still less could Mrs. Merrick have entered into such a contract with such a man had not her reason been dethroned. No one will suffer by the decree below unless it be the wrongdoer himself. No right or interest of society demands that such a marriage should be upheld.

We think the chancellor rendered his decree in accordance with the law and the evidence upon both branches of the case, and it will accordingly be affirmed.

*Decree affirmed.*

Mr. JUSTICE CARTER took no part.