## Jannett C. Pyott v. James M. Pyott et al.

1. Senile Dementia.—*Defined.*—In medical jurisprudence senile dementia is that form of insanity in an old man which indicates the breaking down of the mental powers in advance of bodily decay.

2. Marriage Contracts—*By Persons Non Compos Mentis, Void.*—When the mental capacity is such that the party is incapable of understanding the nature of the contract itself, and incapable, from mental imbecility, to take care of his personal property, he can not dispose of his own person by marriage contract any more than by any other contract.

3. Chancery Practice—*Cross-bill Ordinarily a Method of Defense.*—A cross-bill is ordinarily a method of defense and is especially resorted to when an affirmative defense exists whereby a complete adjudication between the parties may be effected of all the issues presented by the original bill.

4. Same—*Defense by Cross-bill.*—It is often true that the same matters that will constitute a full negative defense to the original bill, if set up by cross-bill will afford ground for affirmative relief that will effectually prevent further litigation over the same issue presented by the original bill.

5. Same—*Cross-bill in Suits for Separate Maintenance.*—A cross-bill to annul the marriage relation will lie in a suit for separate maintenance.

6. Same—*Appointment of Guardian ad Litem.*—It is the duty of the court upon proper suggestion or petition made in a cause pending in

equity to appoint a guardian *ad litem* to any infant or insane defendant (if there is no conservator of such insane person) in such cause.

7. GUARDIANS AD LITEM—*General Powers of.*—A guardian *ad litem* may make any defense either by way of answer or cross-bill, or both, that occasion may require or the court may order.

**Bill for Separate Maintenance.**—Cross-bill to annul the marriage contract. Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1899. Affirmed. Opinion filed July 5, 1900.

JAMES SMITH, attorney for appellant.

The procedure and practice on an adjudication of insanity must conform to the statute or to the procedure adopted in England previous to the fourth year of James I. of England, and must be by jury. Dodge v. Cole, 97 Ill. 338; Blackstone's Commentaries, Book 1, p. 303 and 304; Blackstone's Commentaries, Book 3, p. 427; Story's Equity Pleading (8th Ed.), par 64 and 65; Am. & Eng. Ency. of Law, Vol. 11, p. 118; Barbour's Chancery Practice, Vol. 2, p. 220 and 240; Ritchie v. People, 155 Ill. 98; Myatt v. Walker, 44 Ill. 485; Hahn v. Huber, 83 Ill. 244; Meeker v. Meeker, 75 Ill. 260; Guild v. Hull, 127 Ill. 523; Brown v. Miner, 128 Ill. 149; Niel v. Morley, 9 Vesey, 478; Hall, Ex parte, 7 Vesey, 261; Shelford's Treatise on Lunatics, par. 252, 260, 428, 630.

A bill to set aside the contract of a lunatic or insane person must be brought by his conservator. Covington v. Neftzger, 140 Ill. 608; Dorsheimer v. Roorback, 18 N. J. Eq. 439; Fry v. Fry, Solicitor's Journal, Vol. 34, p. 250 (1889 and 1890); Story's Equity Pleading, 64; Daniell's Chancery Practice, 3d Ed. 79; Shelford on Lunatics, 415.

In cases where marriage is attempted to be set aside on the ground of mental weakness or insanity the test is; did the person possess sufficient mental ability at the time he was married to understand, in a reasonable manner, the nature and effect of what he was transacting. If so, the marriage is valid. Bishop on Marriage and Divorce, Vol. 1, p. 600; Lumer v. Mayer, 1 Hagg. Cons. 414; Durham v. Durham, 10 Prob. Div. 95; Tiffany on Domestic Relations, p. 16.

Ante-nuptial incontinence on the part of a woman is no ground for annulling a marriage, unless the woman is actually pregnant at the time of the marriage. Allen's Appeal, 99 Penn. St. 196; Reynolds v. Reynolds, 3 Allen, 605; Varney v. Varney, 52 Wis. 120; Bishop on Marriage and Divorce, 459 and 480; Tiffany on Domestic Relations, p. 10; Leavitt v. Leavitt, 13 Mich. 452.

R. M. WING and JESSE COX, attorneys for appellees, contended that the alleged marriage between appellee James M. Pyott, senior, and appellant, was absolutely void from the beginning, and was valid for no legal purpose, by reason of the fact that the said James M. Pyott, senior, was at the time of said alleged marriage insane, and therefore incapable of contracting marriage.

And under the statutes of Illinois, the words " insane person," and "lunatic," include every idiot, *non compos*, lunatic, insane or distracted person. R. S. Ill., Chap. 131, Section 1, Clause 6, Hurd's Edit. of 1897, p. 1540; R. S. Ill., title Marriage, Chap. 89, Sec. 2, Hurd's Edit. of 1897, p. 1068.

These provisions are only declaratory of the common law. Orchardson v. Cofield, 171 Ill. 14, 32; Owings' case, 1 Bland's Chancery, 389, 390.

The alleged marriage between James M. Pyott, senior, and appellant, being absolutely void, its invalidity could be shown in any court, between any parties, either in the lifetime of the parties thereto, or after their death; the marriage being a nullity, no decree was necessary to avoid the same. Orchardson v. Cofield, 171 Ill. 14, at p. 32; Cartwright v. McGown, 121 Ill. 388; Reeves v. Reeves, 54 Ill. 332; Bishop on Marriage, Divorce and Separation, Vol. 1, Sec. 618.

The two ingredients of fraud and insanity blending, produce a nullity of the pretended marriage. Orchardson v. Cofield, 171 Ill. 14, at p. 38; Lyndon v. Lyndon, 69 Ill. 43; Countess of Portsmouth v. The Earl of Portsmouth, 1 Hagg. Eccl. Rep. 355; Browning v. Reane, 2 Phill. Eccl. Rep. 69;

Foster v. Means, 1 Speer's Equity, 569 (14 S. Car.); Gillett v. Gillett, 78 Mich. 184; Bishop on Marriage, Divorce and Separation, Vol. 1, Sec. 613; Allore v. Jewell, 94 U. S. 506; Jones v. Thompson, 5 Del. Ch. 374; Harding v. Handy, 11 Wheat. 103; Kempson v. Ashbee, Law Rep. 10, Chancery Appeals, p. 15; Keyes v. Keyes, 26 N. Y. Supp. 910; Hull v. Hull, 15 Jurist, 710; Harford v. Morris, 2 Hagg. Rep. 423; Ferlat v. Gojon, Hopkins' Ch. (N. Y.) 478.

Ante-nuptial incontinence is a ground for setting aside a marriage, where that fact is not made known to or is concealed from the intended husband; especially is this true where the wife has been a public prostitute. King v. Brewer, 29 N. Y. Supp. 1114, at p. 1117; Page on Divorce, p. 161; Revised Statutes of W. Va., Vol. 1, Chap. 69 p. 495, Sec. 5; Statutes of Maryland, Public Laws of Maryland, Article 16, Sec. 36, p. 143.

The litigation in this cause was commenced by appellant. She filed a bill against James M. Pyott, senior, and the other appellees, alleging a marriage, and praying for separate maintenance by James M. Pyott, senior, and that the conveyances by him to the other appellees might be set aside as being in fraud of her marital rights. James M. Pyott, senior, being insane, and having no conservator, it was the imperative duty of the court to appoint a guardian ad litem to defend said suit on behalf of James M. Pyott, senior. R. S. Ill., title Chancery, Chap. 22, Sec. 6, p. 220; Brown v. Miner, 128 Ill. 150; Maloney v. Dewey, 127 Ill. 395, 404; Daniell's Chancery Practice, Vol. 1, pp. 169, 764, 766, 767.

The cross-bill, being merely a method of defending the suit commenced by appellant, and of giving full force and effect to the defense, was properly filed and prosecuted by the guardian ad litem of James M. Pyott, senior, duly appointed by the court; and also by the other appellees, whose property rights under certain conveyances were attacked by appellant on the ground of her alleged marriage. Story's Equity Pleadings, sections 393 and 399; Newberry v. Blatchford, 106 Ill. 599.

An original bill, filed to set aside the marriage on the ground of insanity of James M. Pyott, senior, and the procurement of such marriage by the fraud and imposition of appellant and her relatives, would have been properly filed on behalf of James M. Pyott, senior, by his next friend and guardian *ad litem*, duly appointed by the court; such bill would have sought merely to have an act, void for all purposes, declared void, and therefore would not have required the exercise of any disposing mind. The appointment for that purpose of a conservator for James M. Pyott, senior, was unnecessary. Speck v. Pullman Palace Car Company, 121 Ill. 33; Ryder v. Topping, 15 Ill. App. 216; Bird v. Bird, 21 Gratt. 712; Reese v. Reese, 89 Ga. 645; Whetstone v. Whetstone, 75 Ala. 495; Newcomb's Executors v. Newcomb, 76 Ky. (13 Bush) 544; Smith v. Smith, 106 N. C. 498; Parsons v. Kinzer, 71 Tenn. (3 B. J. Lea) 342; Owings case, 1 Bland's Chancery Rep., 370 and 373; Wilson v. Oldham (12 B. Mon.), 51 Ky. 55; Plympton v. Hall, 55 Minn. 22; 56 N. W. Rep. 351; Light v. Light, 25 Beav. 248; Nelson v. Duncombe, 9 Beav. 211, 231; Higginson v. Hall, L. R. 10, Ch. Div. 235; Denny v. Denny, 8 Allen, 311; Garnett v. Garnett, 114 Mass. 379; Pennington v. Thompson, 5 Del. Ch. Rep. 328; Jones v. Thompson, 5 Del. Ch. 374; Jones v. Lloyd, Law Rep. 18, Equity, 265; Beall v. Smith, Law Rep. 9, Chancery Appeals, 85; Malin v. Malin, 2 Johns. Ch. 238; Am. & Eng. Ency., Vol. 11, p. 126; Buswell on Insanity, Sec. 120.

A person of weak intellect, though not entirely *non compos*, whether such weakness arises from extreme age or extreme youth, from sickness or any other cause, who has been misled by designing persons into an injurious contract of any kind, by reason of such weakness of mind, may file a bill in his or her own name, by next friend, or otherwise, to set aside such transaction. Especially is this true of the contract of marriage. Light v. Light, 25 Beav. 248.

MR. JUSTICE SHEPARD delivered the opinion of the court.

Appellant filed her bill in equity against James M. Pyott, senior, for separate maintenance, alleging that she was law-

fully married to him on October 20, 1898, and that they lived and cohabited together as man and wife until November 21, 1898, when, without just or reasonable cause, he deserted and abandoned her, and that she is now living separate and apart from him without fault on her part.

The bill also alleged that the agreement or engagement to marry was entered into by the parties on October 12 (shown by the evidence to be October 14), 1898, and that on that day he represented to her that he was the owner of much valuable real estate and other property, situated in Chicago and elsewhere, particularly specifying some of it, and that she relied upon said representations, among others, as inducements to marry him.

It is also alleged that after the marriage she learned for the first time that her husband, in fraud of her marital rights, had pretended to convey by warranty deeds unto three of his children by a former marriage, naming them, a certain large part of his property, specifying it; that said deeds purported to have been executed on October 15, 1898, and to have been recorded on October 20, 1898, but that they were not delivered until after the marriage was consummated; and that the total value of his real and personal property equaled $230,000.

The prayer of the bill, besides asking for support and maintenance of appellant, asks that the said conveyances may be decreed to be null and void, and set aside as in fraud of appellant's rights, and that the premises be reconveyed to said Pyott, senior, or that the grantees therein named may be directed to hold the premises in trust to secure the rights of appellant. All the defendants united in a joint and several answer to the bill, the said Pyott, senior, answering by his next friend, James M. Pyott, junior, and a cross-bill was also filed by them.

Omitting mention of intervening matters, the court subsequently, by an order duly entered upon a sworn petition therefor, appointed James M. Pyott, junior, guardian *ad litem* and next friend of said James M. Pyott, senior, to defend and prosecute said cause in the name and for said

Pyott, senior, and gave leave to amend and refile the cross-bill already filed. The order making such appointment expressly reserved the question of the sanity and soundness of mind of Pyott, senior, until the final hearing, and it was agreed in open court and made a part of the order that if on the trial it should appear that Pyott, senior, was not insane, the answer and cross-bill filed for him by next friend and guardian *ad litem* should stand as his own.

Substantially the same matters were set up, in both answer and cross-bill, to wit, that at the time of the claimed marriage and for a long time prior thereto, and up to the filing of said answer, the said James M. Pyott, senior, was not of sound mind and memory, but was insane; that he was seventy-two years of age, and in his dotage, and his mind and memory were so impaired as to render him incapable of entering into any contract of marriage; and that the marriage was null and void for that reason; and alleged that the complainant, one James C. Whiteford, and E. Erskine McMillan, fraudulently combined, confederated and conspired, by unlawful means, to induce the said James M. Pyott, senior, to participate in said pretended marriage ceremony with the complainant; that the said James M. Pyott, senior, in participating in said marriage ceremony, was under improper restraint and undue influence of Jannett C. Pyott, the appellant, James C. Whiteford and E. Erskine McMillan; that James C. Whiteford had been for many years prior thereto the warm and confidential friend of the said James M. Pyott, senior, and had by his acts and protestations of friendship gained the entire confidence of the said James M. Pyott, senior, and owing to the unsoundness of mind and memory of the said James M. Pyott, senior, at and before the said marriage ceremony, had by fraudulent misrepresentations and undue and wrongful influences, completely subjugated the mind of the said James M. Pyott, senior, to the will of the said James C. Whiteford; that Whiteford was an uncle of the appellant and the appellant was a near relative to the wife of E. Erskine McMillan; that the appellant prior to her said marriage was a woman of

bad moral character, lewd and unchaste; that she was the mother of a bastard child; that she had led the life of a prostitute in the city of Chicago; that she was a woman of low character and wholly unfit to be the wife of James M. Pyott, senior; that such facts were known to Whiteford and McMillan, and, knowing these facts, they represented to James M. Pyott, senior, that she was a good and virtuous woman, and a fit and proper person to be the wife of James M. Pyott, senior; that the marriage was brought about in secret; that it was concealed from the children, relatives and disinterested friends of James M. Pyott, senior; that James M. Pyott, senior, had then living five children—James M. Pyott, Jr., Addie J. Robison, Albert E. Pyott, William C. Pyott and George W. Pyott, all of whom are of mature age; that James M. Pyott, senior, had always heretofore lived with the said children on the most intimate and affectionate terms; that the fact of his marriage was concealed from his children; that James C. Whiteford and E. Erskine McMillan, in pursuance of said conspiracy, caused said marriage to be secretly and clandestinely performed at the residence of E. Erskine McMillan.    The answer admits that James M. Pyott, senior, was seized in fee simple of the valuable real estate described in the bill of complaint on the 15th day of October, A. D. 1898; that the property was valuable property, of the value of $100,000; but by reason of his advanced age and mental unsoundness he became utterly incapable and indifferent to the proper management of his property; that the children became alarmed lest he should incumber or make some disposition of his property which would unduly affect his interest and perhaps squander the same; that they did not wish the mental unsoundness of James M. Pyott, senior, exposed in the Probate Court by having a conservator appointed, and being desirous of preserving the property of James M. Pyott, senior, the same as if a conservator was appointed, they induced him to execute a deed of his property to James M. Pyott, Jr., Addie J. Robison and Albert E. Pyott, as trustees, and that at the time of the execution of the deeds they executed a declaration of

trust, declaring that they held said property in trust for James M. Pyott, senior, and that they had no knowledge or intimation that he was about to be married.

The cross-bill further alleged that the appellant, James C. Whiteford and E. Erskine McMillan, in pursuance of said conspiracy, did procure Samuel T. Baker, a person in the employ of Mr. McMillan, to obtain the marriage license and to swear that James M. Pyott, senior, was sixty-five years of age, when in fact he was seventy-two years of age, and that the said James M. Pyott, senior, was led to believe that he was getting a housekeeper, and not a wife; and the affirmative relief prayed that the marriage might be declared null and void and of no effect, and that the conveyance of the property referred to, might be declared to be good and valid.

The appellant answered the cross-bill, denying specifically all its allegations of fraud and conspiracy, and denying that Pyott, senior, was or ever had been insane, and alleging that no inquisition was ever had concerning him, that no adjudication was ever made by any court or tribunal relative to his insanity, and that no application to have him declared insane had ever been made, and charging that all the allegations of the cross-bill that he was of unsound mind were a scheme to defraud her out of her marital rights.

Much evidence was heard by the circuit judge, both in open court and by deposition, with the result that he dismissed appellant's bill for want of equity and gave a decree under the cross-bill, declaring the said marriage to be null and void and of no effect from the beginning. Numerous findings were made by the decree, and the marriage was pronounced void upon two grounds: (a) the insanity of Pyott, senior, and (b) that it was effected by fraud and circumvention on the part of appellant and one James C. Whiteford, by a fraudulent conspiracy between whom, it was found, the marriage ceremony was brought about for the wrongful purpose of securing to themselves the property of Pyott, senior.

Pyott v. Pyott.

The finding of the decree with reference to ground *a*, was as follows :

" That at the time of the performance of said purported marriage ceremony the said James M. Pyott, senior, was of the age of seventy-three (73) years, and that at the time of said purported marriage ceremony, and for a long time prior thereto, the said James M. Pyott, senior, was, and has ever since said time continued to be, insane, and not of sound mind and memory; that the said James M. Pyott, senior, was then in his dotage, and the mind and memory of said James M. Pyott, senior, was so impaired as to render the said James M. Pyott, senior, wholly incapable of entering into the marriage contract, and that said facts were at and before the time of said purported marriage ceremony known to the said complainant and cross-defendant, Janette C. Patton, and to one James C. Whiteford, in said cross-bill of complaint, and hereinafter named; and that said purported marriage contract was and is therefore null and void and of no effect from the beginning."

The findings in support of ground *b* consist mostly of evidentiary facts and are too numerous and lengthy to be reproduced.

While it may be questioned if there was sufficient proof of conspiracy and fraud on the part of appellant and Whiteford to warrant the legal conclusion that because thereof alone the marriage was null and void, such proof in that regard as was made has a most important bearing upon the other proposition that Pyott, senior, was insane at the time, and before the marriage took place.    Such fraud may properly be taken " into consideration in connection with the evidence of the mental incapacity of Pyott, senior, at the time of the alleged marriage.    *    *    *    The two ingredients of fraud and insanity thus blending, often in matrimonial causes produce by their united action a nullity which neither could alone effect." Orchardson v. Cofield, 171 Ill. 14 (on pp. 37 and 38).    The arts that were practiced upon him tend far to show that he had no independent mind of his own concerning the claimed marriage, or any of the preliminary arrangements that culminated in his participation in the marriage ceremony.    In everything that was proposed and done he seems to have been the pliant instrument of the two

persons referred to, aided by one or two other actors in the
affair.   It seems to have been for them to bid and for him
to do, with but little appreciation by him of the conse-
quences of his doing.   Although he wanted a housekeeper
he seems to have had no conception of the difference between
securing one, and marrying a wife.

"Where weakness of mind is not of itself a sufficient
ground for equitable interference, it will nevertheless always
constitute an important element in actual fraud.   If a trans-
action be in the slightest degree tainted with deceit, the
intellectual imbecility of the party may be held by a court
of equity to make out a case of actual fraud which other-
wise might be incapable of proof.   The cause of mental
weakness is immaterial.   It may arise from injury to the
mind, temporary illness or excessive old age.   In such cases
any unfairness will be promptly redressed." Jones v.
Thompson, 5 Del. Ch. 374.

The other and direct proof of the condition of dotage or
senile dementia that afflicted Pyott, senior, at the time the
marriage was performed, and for two or more years prior
thereto, and down to the time of the trial, is convincing in
extent and character, and abundantly sustains the allega-
tions of the cross-bill and decree in that respect.

It would take many pages to fairly reproduce it, and
would not be of especial value in any other case.   It
consisted of the testimony of five physicians, learned in
their profession, whose testimony we regard as being en-
titled to great weight, all of whom concur in the opinion
that his is a well developed, or as one calls it, a typical case
of senile dementia—describing in detail the causes and symp-
toms of that condition—and that he was wholly incompe-
tent to transact ordinary business or to take a rational view
of the marriage contract.

Added to such evidence is the testimony of members of
his family, and numerous business and social acquaintances,
who detail many circumstances, acts and words, that go
to show the existence of the infirmity that the physicians
declare it to be, and his own testimony on the witness
stand.

In medical jurisprudence, dementia is that form of insan-

ity which is characterized by mental weakness and decrepitude, and by total inability to reason. In the case of old men it is called senile dementia, and it indicates the breaking down of the mental powers in advance of the bodily decay; the mind dwells only in the past and the thoughts succeed one another without any obvious association. Bouvier's Law Dictionary (Rawle's Ed. of 1897), under heading of "Dementia."

The Century Dictionary defines it to be "an extremely low condition of the mental function; profound general mental incapacity."

The physicians who testified agree that senile dementia is an incurable condition that progresses as age advances.

It is said in Owings' case, 1 Bland's Ch. (Md.) 370, that though physicians do not regard it as being in itself a disorder or the effect of disease, "the law considers it not only as a species of insanity, from which there is no hope of recovery, but as one which always becomes worse as age advances."

The evidence is convincing and satisfactory that about two or more years before this marriage the mental faculties of Pyott, senior, began their visible decay; that from having been for forty years an active business man, in full vigor physically and intellectually, and a scrupulous observer of the proprieties of social life, he commenced to degenerate. He gradually yielded up all business to the care of his sons, abandoned all his former intellectual pursuits, gave up his previous habits of tidiness in dress and general decorum, and became slovenly to the point of impropriety, if not of indecency, in clothing and person, became vulgar in conversation, and generally degenerate.

It seems to be fairly established, also, that his sons and daughter had previously contemplated subjecting his estate to a conservatorship, but, from dislike of the publicity and notoriety of such a proceeding, had delayed it.

As was well said by the circuit judge in rendering his decision :

"Just what degree of mental defect or disease is suf-

ficient to invalidate a marriage is a question as to which the authorities are somewhat at variance. The rule generally laid down is that the party must be able to understand the nature of marriage and its consequences. This makes the test whether there is sufficient mental capacity to give an intelligent consent. If the incapacity be such that the party be incapable of understanding the nature of the contract itself, and incapable from mental imbecility to take care of his personal property, such person can not dispose of his own person by marriage contract any more than by other contract.

This is the doctrine as laid down in Tiffany on Domestic Relations, page 16, and he cites numerous authorities in support thereof.

In Hopkins' Chancery, 547, it is said that 'the line of separation between reason and insanity may be difficult to be found and marked out, though it may not be difficult to decide on the result of the circumstances.'

'It has long been established that a contract made by a person who is at the time actually *non compos mentis*, either as in idiocy, delirium, lunacy or dotage, is entirely void; indeed, it would be difficult to conceive how such a contract should ever have been otherwise considered than as an absolute nullity.'" Citing Owings' case, *supra*.

In considering the question we have not neglected to take into account all that the evidence on behalf of appellant tends to show, but from all the evidence on both sides we are not left in doubt that a plain case of such mental imbecility, or dementia, as contradistinguished from mania, is made out, as amounts to an absolute lack of mental capacity on the part of Pyott, senior, to enter into a valid contract of marriage.

It is said in Orchardson v. Cofield, *supra* (on p. 33):

" The question here is not altogether of brain quantity or of brain quality in the abstract, but it is whether or not the mind could and did act rationally regarding the precise thing in contemplation—marriage. In a marriage case the question is whether the alleged insane person acted rationally regarding marriage, and the particular marriage in dispute—not, indeed, whether his contract was wise, but whether it proceeded from a mind sane as respects the thing done."

The remaining question deemed necessary to be discussed,

is as to whether the cross-bill was maintainable in behalf of Pyott, senior, by guardian *ad litem* and next friend.

There may be some doubt whether the question was properly raised in the court below, for after appellant's demurrer to the cross-bill as filed by next friend, was sustained because improperly filed, an order was obtained appointing a guardian *ad litem* and next friend of Pyott, senior, to defend against the original bill and to prosecute the cross-bill, and the proceedings thereafter were so accordingly conducted, without specific objection, so far as we can discover.

But, assuming that the question is in the record, what then ? It should not be overlooked that this is not the case of an original bill filed by or in behalf of an insane person, but is a cross-bill filed in defense to an original bill brought to enforce alleged rights against Pyott, senior, and his property, because of his alleged status as a married man. It is only upon the establishment of his status as the husband of complainant, that any relief claimed against him can be obtained. The issue presented by the bill was as to the existence of such status, and its non-existence, if established by the defense, would be a complete answer to the bill.

A cross-bill is ordinarily a method of defense, and is especially resorted to when an affirmative defense exists, whereby a complete adjudication between the parties may be effected of all issues presented by the original bill.

It is often true, and is so in this case, that the same matters that would constitute a full negative defense to the original bill, if set up by cross-bill would afford ground for affirmative relief that would effectually prevent further litigation over the very same issue presented by the original bill—in this case, the lawfulness of the alleged marriage.

Now the appellant, as complainant, having invoked the jurisdiction of a court of equity to declare the lawfulness of her marriage and give her appropriate relief because thereof, it would seem to be entirely proper, upon a proper showing of the insanity of her alleged husband, to permit him to defend against her bill by a guardian *ad litem* and next friend, by either method or both, answer and cross-bill, and

in the same suit put an end to further litigation over the issues presented by her bill.

It is the duty of the court upon proper suggestion or petition, made in a pending cause in equity, to appoint a guard-. ian *ad litem* to any infant or insane defendant (if there is no conservator of the insane person) in such cause. Sec. 6 of the Chancery Act; Maloney v. Dewey, 127 Ill. 395.

It is a practice that, as applied to infant defendants, is exceedingly common, and when done, we have never known it to be questioned that the guardian *ad litem* might make any defense, either by way of answer or cross-bill, or both, that occasion might require, or that the court should order.

It would be a most unusual proceeding in such cases to enter into a judicial inquiry as to the fact of infancy, in advance of the appointment, though if it should develop afterward in the cause that the pretended infant was of majority, appropriate subsequent orders, and proceedings applicable to such a case, would be proper, and probably necessary.

The analogy in practice between infant and insane defendants seems to us to be complete. It was here represented to the court by sworn petition that Pyott, senior, was insane, and a guardian *ad litem* to him was, we think, properly appointed, it being reserved in the order appointing him that if, as the cause progressed, it was found that he was not insane, the answer and cross-bill filed in his behalf, should stand as his own.

It may be that an original suit for some purposes can not be properly instituted for an insane person except through a conservator. We will not pause to inquire as to that. But we do not assent to the proposition, argued with much plausibility, that a previous inquisition and appointment of a conservator is a prerequisite to the right of an insane person to defend a suit of this kind by a duly appointed guardian *ad litem* and next friend.

And we need not consider what would ensue if, on the hearing, it should develop that the alleged insane person was not so. As we have already held, the insanity of Pyott,

senior, has been clearly established. We therefore consider that the cross-bill here was properly filed, and that the Circuit Court had complete jurisdiction in the case to decree an annulment of the alleged marriage.

We do not consider it to be necessary to discuss whether or not incompetent evidence was heard by the chancellor. The presumption is that all such, if any, was rejected from the mind of the court.

The decree ought to be affirmed, and it will be so ordered.