# JEREMIAH S. MOYER *et al.*

## *v.*

## CAROLINE SWYGART.

*Filed at Ottawa June 16, 1888.*

1. WILL—*whether a will was completed.* A person being desirous of making a will, made a writing purporting to be his will, by which he devised a farm and a horse and buggy to a son, making no mention therein of his other heirs, from whom he was in no way estranged, and leaving the personal estate undisposed of. The scrivener, on the day he was called to write the will, only proceeded so far as to write a devise of the farm to the son. The decedent, when asked what disposition he wished to make of his personal property, said "he had not made up his mind about that," and that he "would like to think that over," and asked if he "could do that to-morrow or any other day." On the next day, the scrivener asked the decedent if he wanted to go on with the will, to which he replied that he wanted "to finish it up," and when asked what he wanted to do, said he wanted to give his son the farm,—"you have got that; I want to give him the horse and buggy." That being written he said nothing more until again asked what disposition he wanted to make of his personal property, when he replied, as before, that he had not determined on that yet, and again inquired if he could not fix that hereafter. He was advised that it could be done by a new will or codicil. At the suggestion of the scrivener an executor was named, and the paper signed and witnessed: *Held*, in a suit contesting the will, that these facts were sufficient to warrant the jury in believing that the will was never, in fact, finished.

2. SAME—*contesting a will—of the burden of proof.* Where a bill in chancery is filed, under the statute, to contest a will, the law in the first instance casts the burden of proving the will upon the proponents alleging its validity.

3. SAME—*an instruction construed as not relating to burden of proof as to undue influence.* On the trial of an issue as to the validity of an alleged will, an instruction which declares that before the jury can find the paper read in evidence is the will of the decedent, it must appear, from the evidence, he was "of sound mind, and did not execute the paper read in evidence as his will under undue influence at the time he signed the paper," is not open to the charge that it casts on the proponents the burden of proving the will was executed without undue influence on their part.

4. SAME—*testamentary capacity—evidence in respect thereto.* In this case, upon the question as to the testamentary capacity of a person whose alleged will was being contested, the evidence is reviewed, and the finding

that the paper presented as the will of the decedent was not his will, is sustained.

5. SAME—*of the decree, setting aside a will.* A decree setting aside an alleged will, which declares that the probate of such will in the county court, and the proceedings thereunder, are set aside and declared null and void, is not erroneous, as being too broad.

6. SAME—*new trial—on contest of will.* The finding of the jury on the contest of a will, by bill in chancery, is conclusive, unless clearly against the weight of the evidence, the same as in cases at law.

7. Where there is an irreconcilable conflict in the testimony touching the facts upon which the validity of a will depends, this court will not reverse the decree of the lower court, if the evidence of the successful party, when considered alone, is clearly sufficient to sustain the verdict.

8. COSTS—*against executor—on contest of will.* Where a decree is entered setting aside an alleged will, there is no error in requiring the parties defending, including the executor, to pay the costs.

9. SAME—*former decision.* The decree for costs against the person claiming to be the executor in the will which was set aside, is sustained by the case of *Shaw* v. *Moderwell,* 104 Ill. 64; and so far as there may appear to be a conflict in the rule stated as to costs in such cases, the decision in *Pingree* v. *Jones,* 80 Ill. 177, must be regarded as having been modified by the decision in the later case of *Shaw* v. *Moderwell.*

10. PRACTICE—*waiver of objection to evidence—where both parties avail of it.* Where both parties on the contest of a will, by bill in chancery, give in evidence the statements and conversations of the decedent made by and with him long before the making of the alleged will, neither party will be heard to insist that such statements and conversations were not competent evidence.

WRIT OF ERROR to the Circuit Court of Lee county; the Hon. WILLIAM BROWN, Judge, presiding.

Mr. SHERWOOD DIXON, for the plaintiffs in error:

To vitiate a will on account of undue influence, it must appear that there was something wrongful,—a species of fraud perpetrated. *Yoe* v. *McCord,* 74 Ill. 33; *Dickie* v. *Carter,* 42 id. 376.

Statements and declarations of a testator are not competent evidence to prove the facts stated. (*Shailer* v. *Bumstead,* 99 Mass. 100.) They are competent to show mental condition at

the time the will was executed, or so near the time the same state of affairs must have existed, (*Reynolds* v. *Adams*, 90 Ill. 135,) being thus decreed a part of the *res gestæ*. *Cockeram* v. *Cockeram*, 17 Bradw. 604.

Circumstances that will not warrant an inference that a will was obtained by undue influences : That the testator was in a condition susceptible to influence, and cared for by one whose interest might be to unduly influence him, as, a wife with a dissolute husband : *Dickie* v. *Carter*, 42 Ill. 388 ; *Gardner* v. *Gardner*, 22 Wend. 526.—That the testator gave the bulk of his property to those around him, to the exclusion of others at a distance : *Remsen* v. *Brinckerhoff*, 26 Wend. 340.—That the testator was on his death-bed, surrounded by the beneficiaries of his will : *Bundy* v. *McKnight*, 48 Ind. 502.—That the testator was dependent upon the one in whose favor the will was made, in all his domestic and pecuniary affairs : *Bleecker* v. *Lynch*, 1 Bradf. 458.—That an old, helpless man made his will in favor of a son who had for years cared for him, and attended to all his affairs : *Elliott's Will*, 2 J. J. Marsh. 340. To the same effect, see *Rutherford* v. *Morris*, 77 Ill. 397.

Kind attentions, etc., have their influence, and it must be presumed the testator, knowing and feeling their force, has acted correctly. *Meeker* v. *Meeker*, 75 Ill. 260.

There must be proof of influence amounting to coercion, and that the will was obtained by this coercion. He must put his finger on the act, showing how it was wrought. *Williams* v. *Goude*, 1 Hagg. Eccl. 577 ; *Gardner* v. *Gardner*, 22 Wend. 526.

The court erred in admitting the declarations of John Moyer, made long before the will was executed, that he should make no will, and as to alleged importunities of Jeremiah Moyer. Such testimony is only competent when so near the time of the will as to constitute a part of the *res gestæ*. 2 Greenleaf on Evidence, sec. 690 ; *Boylan* v. *Meeker*, 4 Dutch. 274 ; *Cockeram* v. *Cockeram*, 17 Bradw. 604 ; *Reynolds* v. *Adams*, 90 Ill. 134.

Appellee's sixth instruction, considered in connection with the third, fourth and fifth, casts the burden of proof as to undue influence upon appellants, and was for that reason erroneous. *Roe* v. *Taylor,* 45 Ill. 485. See, also, similar charge held error: *McMechen case,* 17 W. Va. 683.

Appellee's seventh instruction erroneously told the jury that undue influence might be inferred from any circumstances in evidence. Many circumstances of suspicion may exist and not warrant such inference. Was there fraud? Was there terror? Was there harassing importunity, and a compliance for sake of peace? (*Gardner* v. *Gardner,* 22 Wend. 526.) It is only inferred from such circumstances as are inconsistent with any other hypothesis. It is like fraud, and can not be inferred unless all the facts proven satisfy the jury that it existed. 1 Jarman on Wills, 134; *Wood* v. *Bishop,* 1 Demorest, 512; *Dale* v. *Dale,* 36 N. J. Eq. 269; *Reed* v. *Noxon,* 48 Ill. 323.

Appellee's fifteenth instruction incorrectly defines a disposing mind and memory. This court has said the form in which it can best be given to the jury is, that the testator at the time knew and understood what he was about. *Yoe* v. *McCord,* 74 Ill. 33; *Trish* v. *Newell,* 62 id. 196.

The decree is erroneous in awarding costs against the executor, (*Russell* v. *Hubbard,* 59 Ill. 335, *Pingree* v. *Jones,* 80 id. 177,) and in setting aside all the proceedings in the county court. All proceedings had in the county court, under the will, done in good faith, are valid. 2 Kent's Com. 413; *Wight* v. *Wallbaum,* 39 Ill. 554; *Shephard* v. *Rhodes,* 60 id. 301.

Messrs. W. & W. D. BARGE, for the defendant in error:

The verdict of the jury in a case of this kind, stands like a verdict in a case at law. *Rutherford* v. *Morris,* 77 Ill. 402; *Long* v. *Long,* 107 id. 210; *Bible Society* v. *Price,* 115 id. 623.

Proof of the statements of deceased was confined to those made in the last two years of his life, and was given by both

parties. They would show the condition of his mind, and form part of the *res gestæ.* It is no objection that these statements were made months before the execution of the will. *Brownfield* v. *Brownfield,* 43 Ill. 147; *Bible Society* v. *Price,* 115 id. 623; *Reynolds* v. *Adams,* 90 id. 135.

For the purpose of proving the effect of the influence on the testator, his declarations were clearly competent. *Storey's Will,* 28 Minn. 9; *Turner* v. *Cheeseman,* 15 N. J. Eq. 243; *Boylan* v. *Meeker,* id. 343; *Edge* v. *Edge,* 38 id. 210; *Dale* v. *Dale,* id. 275; *Bates* v. *Bates,* 27 Iowa, 110; *Stephenson* v. *Stephenson,* 62 id. 163; *Lewis* v. *Mason,* 109 Mass. 169; *Potter* v. *Baldwin,* 133 id. 427.

The burden of proving that the paper is a valid one, rests upon the proponents. *Rigg* v. *Wilton,* 13 Ill. 15; *Potter* v. *Potter,* 41 id. 80; *Tate* v. *Tate,* 89 id. 42; *Delafield* v. *Parish,* 25 N. Y. 29; *Rogers* v. *Thomas,* 1 B. Mon. 390; *Haydon* v. *Haydon,* 6 J. J. Marsh. 48; *Taff* v. *Hosmer,* 13 Mich. 309; *Harris* v. *Vandever,* 21 N. J. Eq. 561; *Rolwagen* v. *Rolwagen,* 63 N. Y. 504.

They must, in the first instance, produce all their proof. *Mueller* v. *Rebhan,* 94 Ill. 142.

There is no presumption that a person making a will is sane. *Gerrish* v. *Nason,* 22 Maine, 438; *Cilley* v. *Cilley,* 34 id. 163; *McGinnis* v. *Kempsey,* 27 Mich. 373; 2 Wharton on Evidence, sec. 1252.

The proponent must show, on the whole case, that it is a valid will, and made by a person free from fraud, coercion or undue influence. Schouler on Executors, secs. 73, 79; *Trish* v. *Newell,* 62 Ill. 196; *Dale* v. *Dale,* 38 N. J. Eq. 274; *Comstock* v. *Hadlyme,* 8 Conn. 260; *Barker* v. *Conners,* 110 Mass. 477; *Taff* v. *Hosmer,* 14 Mich. 309.

Undue influence need not be shown by direct proof, but may be inferred from circumstances proved. 1 Jarman on Wills, 130; *Brick* v. *Brick,* 66 N. Y. 144; *Seares* v. *Shafer,* 6 N. Y.

272; *Tyler* v. *Gardiner,* 35 id. 559; *McLoughlin* v. *McDevitt,* 63 id. 213; Bigelow on Frauds, 476.

The defendants John E. Moyer and Eva Cline, being heirs of the deceased, were necessary parties, *(Brown* v. *Riggin,* 94 Ill. 560,) and having resisted the bill, should pay costs.

The decree of costs against the executor was proper. *Shaw* v. *Moderwell,* 104 id. 64; *Knowles* v. *Knowles,* 86 id. 1.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

This is a bill in chancery, brought by Caroline Swygart, against Jeremiah S. Moyer, John E. Moyer, Eva Kline and John D. Crabtree, to contest and have set aside what is alleged to be the will of John Moyer, deceased. Complainant is the only surviving daughter of decedent, and the other defendants, except Crabtree, are his only other heirs-at-law. It appears from the record, the estate of decedent was of about the value of $30,000, and consisted of a farm of about the value of $10,000 or $12,000, and the balance consisted of notes, bonds and other securities, and some few articles of personal property. The alleged will gave to Jeremiah S. Moyer the entire farm, and a horse, carriage and harness. No mention is made of the residue of his estate, and as to that, of course, decedent died intestate. Nor is any mention made of any of his heirs other than his son Jeremiah S. Moyer, to whom he gave his farm and the articles of personal property enumerated.

It is alleged in the bill, that at the time of the making of what is claimed to be a will, decedent was not of sound mind and memory, but, on the contrary, he was in his dotage, and his mind and memory so impaired as to render him wholly incapable of making any distribution of his estate, and that the making of the will which proponents insist upon maintaining, was procured by the fraudulent practices and undue influence of defendant Jeremiah S. Moyer. These matters are amplified, as is usually done in stating the facts upon which a

party relies for equitable relief.   The answer of defendants admits only the formal charges of the bill, as to which no controversy exists, but denies all improper conduct on the part of Jeremiah S. Moyer, and insists the provisions of the will were not the result of undue influence, but of the deliberate judgment of decedent, and made by him in "pursuance of a long cherished purpose."   As the statute directs shall be done, the circuit court caused an issue to be made up "whether the writing produced be the will" of John Moyer, deceased.   That issue was submitted to a jury chosen under the direction of the court, who found, from the evidence adduced at the trial, "the writing read in evidence is not the will of said John Moyer, deceased."   On the coming in of the verdict, defendants made a motion for a new trial.   That motion the court overruled, and entered a decree setting aside the writing purporting to be the last will and testament of John Moyer, deceased, and the probate thereof in the county court, and all proceedings had thereunder were declared null and void.   The proponents of the will bring the case to this court, and have assigned a number of errors on the record, the most important of which is, "the verdict is manifestly against the evidence," and for that reason it is said the motion for a new trial should have been allowed.

The rule is, on questions of this kind the finding of the jury is conclusive unless clearly against the weight of the evidence, and in this respect they are put upon the same footing with cases at law.   Another rule of law is equally as well settled by the previous decisions of this court.   It is: where there is an irreconcilable conflict in the testimony touching the facts upon which the validity of the will depends, this court will not reverse the decree of the lower court if the evidence of the successful party, when considered alone, is clearly sufficient to sustain the verdict.   The practice, in that respect, has been uniformly adhered to in this court, and no reason is perceived why it should be departed from in the case being considered.   Nothing can be plainer than if the case had been submitted on the testimony

introduced by the contestant alone, the jury would certainly have found that at the time of the execution of the writing purporting to be the will of decedent, he was too feeble, both in body and mind, to transact any business that required thought or the exercise of judgment, and that the making of the writing was procured by the sole devisee named in that instrument. It was shown he had personal estate, consisting of bonds and notes, and perhaps some money, as to which he made no disposition whatever. Nor did he make any reference to contestant, who was his only daughter, or to the children of his deceased son. The testimony as to his mental condition does not all come from parties in interest. Others having no interest whatever in the subject of the litigation visited decedent during his last sickness, and they state that at or about the time the alleged will was written, he was too feeble, mentally, to comprehend much, if anything, and it seems certain he had neither mental nor physical strength to withstand, for any considerable time, the importunities with which the testimony tends to show he was plied to devise the farm to his son. Whether there was any foundation for it or not, it is certain decedent, long before his last sickness, was greatly worried with what he alleged were the importunities of his son to make a will and give him the farm. He seems to have labored under the belief, if he did not comply with his son's wishes in that respect he would serve some sort of papers upon him that would deprive him of the use of his property. It is possible the jury may have believed this was not a mere insane delusion. It is certain he had that belief, whether there was any ground for it or not. Many other things are proved of the same character, all tending to the conclusion decedent was importuned by his son, and perhaps others by whom he was surrounded, to give the farm to the son named in the alleged will. That there is evidence tending to show decedent frequently declared he was constantly urged by his son to make a will by which his son would get the farm, can not be doubted, and the jury may

have believed that in his last sickness, when feeble in mind and body, he was induced to comply, or at least to try to comply, with the urgent wishes of his son as to the farm. This theory of the case finds some support at least in the fact, this pretended will devises no property to any one except to this son, and only the same property which decedent in his utterances, whether sane or insane, always claimed his son insisted he should have, and that he should give it to him by will. It is not practicable to restate every fact in evidence that tends in a greater or less degree to support contestant's theory of the case. But a close study of the evidence shows, past all doubt, if the record contained no testimony other than that given by contestant, the verdict would be amply sustained, and under the previous decisions of this court, it should stand.

The only remaining inquiry on this branch of the case is, does the testimony offered by the proponents to sustain the will, so far preponderate over the testimony introduced by contestant, that the verdict, for that reason alone, should be set aside, and the cause re-submitted to another jury? It is thought it does not. On this branch of the case the testimony is so voluminous it is hardly practicable to restate it in detail, nor is it necessary to do so. The devisee was a witness in his own behalf, and denies all improper practices attributed to him to induce his father to make a will giving him the farm. He also states the condition of his father's mind, at the time the writing was executed, to be such as would tend to show testamentary capacity. Although this witness is directly interested, in a pecuniary view, in the result of this litigation, there is no evidence that he is not a man of character, and is entitled to be treated as any other fair and candid witness. The evidence, as has been seen, is irreconcilably conflicting,— so much so that the jury had to determine, as well as could be done, which theory advanced was the better sustained. To do that, the testimony of one party or the other had to be disregarded, for both could not stand together. In no other

way could a conclusion be reached. This disposition of the evidence by no means implies any improper conduct on the part of any witness. All may be equally candid, and yet one theory of the case may seem to be better sustained than the other.

There are many facts in the case that must have been considered by the jury in coming to a conclusion, and no doubt they were entitled to weight in weighing other testimony. One is, the decedent, at the time of executing the alleged will, was in the eighty-seventh year of his age. It is conceded by all he was exceedingly feeble at or about the time of executing the paper produced as a will,—so much so that he had just before been advised by his attending physician there was "but a step between" him "and death." When at his best, he was a man of great physical powers,—tall and finely proportioned,—and was possessed of such will force as gave him unusual independence of character. No one dominated him in his business affairs, or perhaps otherwise. He seems to have had the greatest affection for his family. In this entire volume of testimony there is not to be found a single harsh or unkind word towards any of his children, and the only time it appears he was ever estranged from his son, it was because he thought his son was correcting his own child with too much severity. But that was only temporary, and he was soon reconciled to him again. This kindly relationship in the family will serve to illustrate a phase of the case that will presently be stated.

The fatal sickness commenced on the 28th of February, 1884. Prior to that time he had shown very marked indications of failing health. His first attack seems to have been accompanied with a chill, was very severe, and when he was first discovered, he was, perhaps, hardly conscious of anything. Towards night of the same day he improved some. On the 22d or 23d of March, of the same year, he suffered a relapse, and from that time on it was apparent his sickness would soon

terminate fatally. It was probably on the 24th day of that month his attending physician had a conversation with him concerning the time he might live, and he told him "the chances were decidedly against him," and "if he had any business matters he wanted to settle, he had better do it." His reply seems more like the delirious utterances of a disordered brain than that of one who understood his critical condition, or, indeed, anything else in regard to his surroundings. Certainly a man that had sense enough to make a will, or to transact any business, would know that a man eighty-seven years old, when advised his sickness was mortal, and that he could live but a brief time, could not "live to bury" his physician, who was a young man. This conversation would indicate, unmistakably, the decedent did not have the slightest understanding of his situation, or what the conversation concerned. "After a day or two," his physician again asked him "if he had his affairs settled." That could not have been earlier than the 25th of March, and the scrivener was sent for and began to draft the will on the 26th of the same month. On that day he wrote to and down to the devise of the farm to defendant Jeremiah S. Moyer. When asked by the scrivener what "disposition he wanted to make of his personal property," decedent replied, "he had not made up his mind about that," and that he "would like to think that over." He inquired of the scrivener if he could do "that to-morrow or any other day," and on being assured he could, that ended the interview that day. It is singular decedent did nothing in regard to making a will, or any disposition of his property, except as his attention was directed to it by the scrivener. On his return on the next day, (the 27th,) he asked decedent if he wanted to go on with his will, and he replied he wanted "to finish it up." Still decedent said nothing further until he was asked what he wanted to do. He then said he "wanted to give Jerry the farm,—you have got that. I want to give him the horse and buggy." The scrivener wrote that clause in. Decedent said nothing more

until he was again inquired of, "what disposition do you wish to make of your personal property?" He replied, as before, he "had not determined on that yet," and again inquired if he could not "fix that hereafter as well as now," and was told by his legal adviser it could be done "either by a new will or codicil." Nothing more was done or said as to the personal estate, nor did decedent express any wish or desire to have anything more written. But his attention was again awakened by the scrivener as to the propriety of naming an executor, and that clause was written. Then came the signing and witnessing what had been written, by the persons called in for that purpose.

It would be difficult to read the account of what was done, as given by defendant's own witnesses, without being impressed with the belief decedent knew but little, if anything, about what was being done about the execution of the paper proponents now produce as his will. It is as certain as anything can be, he did nothing until his attention was first called to what was to be done, and when that was finished he relapsed into silence. His near neighbor, Howell, visited decedent on the 26th of March, and his testimony is to the effect he was feeble,—that his "mind was rather light." He also says Jerry said to him, "you see, he is off his head." Another neighbor, Mr. Crawford, was there about the time the alleged will was written, and found him very feeble, and he states his son said, he "didn't wish any body to speak to his father; the only reason was, he was very weak." There is other testimony to the same effect, but this is sufficient to show the extremely feeble condition of decedent at the time, both physically and mentally.

There is some evidence in this record that would warrant the belief, and the jury may have so found, that the will, which was commenced on the 26th of March, was never in fact finished. After the clause devising the farm was written, on the 26th of March, the scrivener says the further writing was postponed, because decedent had not made up his mind as to

18—125 ILL.

what disposition he wished to make of his personal property. But other reasons are stated by the witness Crawford. As before stated, he says he visited decedent a short time before his death, and on that occasion he testifies defendant Jerry Moyer said, "there was an effort to make a will, and the old gentleman was along so far and could not go farther—was struck by weakness." On the next day, when the scrivener returned, decedent still refused, although his attention was directed to it, to make any disposition of his personal property, for the reason he had not made up his mind as to what disposition he would make of it, and all that was done the second day was to write the clauses in regard to the horse and carriage and harness, and naming the executor, and the latter was not done until after the scrivener first suggested it was usual to name the executor. He still persisted he would bequeath or devise the residue of his property at another time, as he was told by his adviser he could do, but he died without ever having finished his will in that respect, and so the jury might well say the paper presented was not his will. This fact is to be considered with other facts in the case. As has been seen, decedent was fond of all his children, and was heard to say "one child was as good as another," and that he would make no will—he would let the law divide his property. It is said decedent always intended that his son Jerry should have the farm. That may be so, and had he made a will, or finished the one that was commenced for him, he could have given the farm to his son, and made his surviving daughter, and the children of his deceased son, equal with his other son out of his personal estate. But be that as it may, it is idle to claim that a man that had sense enough to make a will at all would make a will simply to dispose of one-third of his estate, without the slightest reference to the residue of his estate, or his children, to whom it would go. No doubt the jury believed, as Mr. Crawford said, decedent "got excited, or was overcome by something or other, and could not go through with it," and

never, in fact, did complete the will commenced, either understandingly or otherwise. It is not possible for this court to say the verdict is against the weight of the evidence, and that being so, the rule of law is; it must stand.

It is said the sixth instruction given for contestant, considered in connection with the third, fourth and fifth of the series, cast the burden of proof, as to "undue influence," upon the proponents of the will. This is an incorrect reading of that instruction. Undoubtedly the rule is, where a bill is filed in chancery, under the statute, to contest a will, the law, in the first instance, casts the burden of proving the will upon the proponents alleging its validity. The third, fourth and fifth charges given for the contestant simply express the general doctrine on this subject as it is declared in the previous decisions of this court, and in that respect they are unobjectionable. The sixth instruction of the series is in no direct way made to be read in connection with the preceding charges, any more than any other of the subsequent charges. It is a distinct charge by itself, as much as any other of the series. Of course, all the charges, both for the contestant and the proponents, should be read together,—this sixth one as well as all others; and when that is done, it is not perceived it is obnoxious to the criticisms made upon it. It simply declares that before the jury can find the paper read in evidence is the will of decedent, it must appear from the evidence he was "of sound mind and memory, and did not execute the paper read in evidence as his will, under undue influence, at the time he signed said paper." That is undoubtedly the law. Nothing is said, however, in that charge, as upon whom the burden of proving "undue influence" rests. Nor were the jury, by any other charge, told, the law cast the burden of proving a will was executed without "undue influence" upon the part of proponents of such will. It will be seen that on this branch of the case, the court, at the instance of contestant, gave the following instruction, and to its being given proponents consented:

"If the jury believe, from the evidence, that John Moyer told the witness Crabtree, and did in his presence all said witness has testified to, yet if the jury further believe, from the evidence, that Jeremiah S. Moyer, or any person for him, had previously exercised undue influence upon said John Moyer, and that by reason of such undue influence, and as a result thereof, said John Moyer said and did, in the presence of said witness, what said witness has testified, and was, by reason of such undue influence, induced to sign said paper, then the jury would have the right to find that said paper is not the will of said John Moyer."

On a close reading, it will be observed the charge given by consent of both parties contains everything that is embraced within the sixth instruction, and there can be no just ground for complaint it was given as written.

Without remarking separately upon all the objections taken to the other instructions, it is sufficient to say the points made have been carefully considered, and it is thought none of them are well taken. It seems certain the charges given contained nothing seriously hurtful to the cause of proponents. It is seldom, if ever, that a record is found to be absolutely free from error, but where no hurtful error has intervened, the rule is, and ought to be, the judgment or decree will be permitted to stand.

The point made, it was error to render a decree for costs against the party claiming to be the executor in the will that was set aside, is disposed of by the decision of this court in *Shaw* v. *Moderwell,* 104 Ill. 64. So far as there may appear to be a conflict in the rule stated as to costs in such cases, the decision in *Pingree* v. *Jones,* 80 Ill. 177, must be regarded as having been modified by the decision in the later case of *Shaw* v. *Moderwell, supra.* (See *Andrews' Exrs.* v. *His Administrators,* 7 Ohio St. 143.) The other defendants, John E. Moyer and Eva Kline, came in and answered, and thereby undertook to sustain the will as against contestant, and as they were un-

successful, there is no reason why they should not pay costs, as well as the other defendants. Both parties gave in evidence the statements and conversations of decedent made by and had with him long before the making of the alleged will, and neither party will now be heard to insist such statements and conversations were not competent evidence.

It is said the decree is broader than the law will warrant, in this: that it declares the "probate of said will in the county court, * * * and the proceedings thereunder, be and the same are hereby set aside, and the same are hereby declared null and void." The decree in *Calvert* v. *Carpenter*, 96 Ill. 63, seems to have been to the same extent, but although the point was made in the Appellate Court the decree in that respect was erroneous, it was not discussed in the opinion rendered in either court. The decree in this respect, it will be perceived, does nothing more than to declare the results that will necessarily follow from setting aside the alleged will. Of course, all proceedings had under it in the county court, or elsewhere, would be without authority of law, and there would therefore be no error in declaring the effect that would follow from the decree finding the alleged will was no will at all.

Every phase of this case, and every point insisted upon for a reversal, has been carefully and patiently considered, and no reason is perceived for departing from the rule so long and so uniformly observed, that where, as was said by this court in *Calvert* v. *Carpenter*, 96 Ill. 67, "there is an irreconcilable conflict in the testimony, this court will not reverse the judgment of the trial court when the evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict." That is precisely the case here, and the decree of the circuit court must stand.

*Decree affirmed.*