## John Alexander Dowie, et al., v. John Benniworth Sutton, et al.

### Gen. No. 12,349.

1. PARTIES—*who not necessary, to bill to set aside will.* In a bill to set aside a will which leaves property to John Alexander Dowie (described as the General Overseer of the Christian Catholic Church, an unincorporated body) and which does not declare a trust, it is not necessary to make such church a party, either by name or by representation.

2. PARTIES—*when objection to, comes too late.* An objection to the insufficiency of parties in a bill to set aside a will comes too late when first made on appeal.

3. WITNESS—*when not disqualified by virtue of interest.* In order to disqualify a witness in a will contest, it must appear that his interest is beneficial and direct.

4. SUBSCRIBING WITNESS—*when not disqualified as witness in will contest.* A subscribing witness is not disqualified as such by virtue of his interest, unless the same be direct and beneficial.

5. LETTER—*effect of date appearing upon.* While the date appearing at the top of a letter affords a presumption of the date when it was written, such presumption is not conclusive.

6. INSANE DELUSIONS—*what evidence competent as tending to show.* Evidence which tends to show that a testator wrongfully believed that his relatives were guilty of acts of theft and that he was under the belief that he was the subject of persecution, is competent as tending to show the existence of insane delusions in the mind of the testator.

7. EVIDENCE—*how objections to, should be preserved in will contest.* In a contest to set aside a will objections to testimony should be made at the trial, even assuming that it is not necessary to preserve exceptions to the rulings made upon such objections.

8. TESTAMENTARY CAPACITY—*what essential to.* To make a valid will one need not "retain all his vigor of mind and memory," but his mind and memory must be sufficiently sound to enable him to know and understand *the business in which he was engaged in executing the will,* judging his competency of mind by the nature of the act to be done *and a consideration of all the circumstances of the case.*

9. JURY—*what not such misconduct by, as calls for reversal.* The conduct of some of the jurymen in criticising the methods and practices of the defendant, who was a church leader, held not ground for reversal where no action by the court was asked at the time of the occurrence complained of.

10. EXECUTOR—*when judgment for costs will not be reversed.* Held, in this case, that a judgment for costs entered against the executor who unsuccessfully defended the will was proper.

Will contest. Appeal from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding. Heard in this court at the March term, 1905. Affirmed. Opinion filed April 5, 1906.

**Statement by the Court.** This is an appeal from a decree of a chancellor in the Circuit Court. This decree first denies a motion of the appellants, who were below proponents of the will of Frederick Sutton, to set aside a verdict theretofore rendered by a jury called under the statute, which found that instruments offered in evidence as the last will and testament and codicil to the last will and testament of Frederick Sutton were not the last will and codicil thereto of said Frederick Sutton. The decree, after denying a new trial, upon the motion of the complainants for a decree in accordance with the verdict of the jury, finds " that the execution of the documents offered in evidence by the proponents and purporting to be the last will and testament of Frederick Sutton, deceased, dated on or about the 22nd day of March, 1902, and a codicil thereto dated on or about the 26th day of March, 1902, was procured by the undue influence of the defendant John G. Speicher, and that the said Frederick Sutton at the time he so executed said document purporting to be such will and codicil was not of sound and disposing mind and memory."

It thereupon orders, " That the probate entered by the Probate Court of Cook County on or about the ninth day of February, 1903, of said documents purporting to be the last will and testament of Frederick Sutton, deceased, and dated on or about the 22nd day of March, A. D. 1902, and a codicil thereto dated on or about the 26th day of March, A. D. 1902, be vacated, set aside, and for naught held, and that said documents be and the same are hereby declared to be null and void." And " That the costs of this case be taxed against the defendants and that complainants have execution therefor."

The bill in this cause was filed February 26, 1903, by John Benniworth Sutton, George Sutton and Charles Sutton, brothers of Frederick Sutton, deceased, Ellen Edridge, his sister, and John Reid Sutton, Thomas George Sutton,

Ernest Walter Sutton, Herbert Charles Sutton, Alice Cath-
erine Sutton and Jessie Ellen Sutton, children of Thomas
Sutton, a deceased brother of Frederick Sutton, and all re-
siding in New Zealand, against John Alexander Dowie in-
dividually and as general overseer of the Christian Catholic
Church, and John G. Speicher, both of Illinois.    It charged
that Frederick Sutton, late of Invercargill, New Zealand,
and now deceased, on March 22, 1902, went through the
form of signing a certain instrument in writing purporting
to be his last will and testament, and afterward, on March
25, 1902, another instrument purporting to be a codicil to
his will, and died March 26, 1902, at Chicago; that Fred-
erick Sutton at the time of his death was a bachelor; that
by the instrument purporting to be his last will and testa-
ment, Frederick Sutton professedly bequeathed the whole
of his estate and effects, real and personal, to John Alex-
ander Dowie, the general overseer of the Christian Catholic
Church, and to his successor and successors as such general
overseer, absolutely and forever, and bequeathed nothing
to any of the complainants; that by the instrument pur-
porting to be a codicil of his said alleged last will and
testament, Frederick Sutton professedly bequeathed to
Ellen Edridge one thousand pounds sterling, and to John
Benniworth Sutton, George Sutton and Charles Sutton,
each five hundred pounds sterling; that these instruments
purporting to be the last will and testament of Frederick
Sutton, deceased, and the codicil thereto, were probated in
the Probate Court of Cook County and letters testamentary
thereon were granted to John G. Speicher, named in said
instrument purporting to be the will of said Sutton as
executor thereof, and said Speicher took upon himself to
act as sole executor of the will and codicil of said Frederick
Sutton.

It charged further that Frederick Sutton, at the time of
executing said instrument in writing purporting to be his
will, and at the time of executing the instrument purport-
ing to be the codicil thereto, was not of sound mind and
memory, but on the contrary was insane; that his mind and

memory were so diseased and impaired as to render him wholly incapable of making any just and proper distribution of his estate.

Further allegations are, that the said pretended last will and testament was written by John G. Speicher, the person therein named as the executor thereof, and that he superintended and procured the signature thereto; that there existed a close confidential relation between said Sutton on the one hand and Speicher, Dowie, Frank W. Cotton and Wilbur O. Ruby (the last two being witnesses to said will) on the other, arising from the facts that Speicher, Dowie, Cotton and Ruby were ecclesiastical and secular officers of the Christian Catholic Church and professed to possess spiritual authority and the power of healing, and that Frederick Sutton was then under their ministration both spiritually and physically, so that the said Dowie, Speicher, Cotton and Ruby sustained towards Sutton the combined relation of priest and physician, and by reason of this relation each of them occupied a position of trust and confidence with Frederick Sutton, and exercised a dominion over the will, judgment and actions of said Frederick Sutton to such an extent, that the pretended acts of said Sutton were really the expression of the will of Dowie, Speicher, Cotton and Ruby, and not the will of said Sutton.

It is further charged in the bill that by reason of the confidential relations existing between Speicher, Dowie, Cotton and Ruby, on the one hand, and Sutton on the other, coupled with the fact that Speicher, acting in behalf of himself and Dowie, drafted and procured the execution of said will in which the Christian Catholic Church was the sole beneficiary, and the fact that the natural objects of the bounty of Sutton were excluded from the benefits of the will, the said pretended will is presumptively fraudulent and void.

It is then specifically alleged that John Alexander Dowie, John G. Speicher and other members, agents and representatives of said Dowie and the Christian Catholic Church, used and exercised undue arts and fraudulent practices and

Dowie v. Sutton.

resorted to falsehood and misrepresentation to induce Sutton to execute said instruments, and that in executing them Sutton was under improper restrictions and undue influence from the acts and fraudulent practices of Dowie and Speicher; that they took Sutton on his arrival in Chicago from New Zealand December 1, 1901, to an institution controlled by Dowie, furnished him a room there and persuaded him to embrace the doctrines and become a member of the Christian Catholic Church; that thenceforward Dowie and his agents and representatives were his only advisors; that he was subservient to their dictation; that he was on his deathbed, weak and subject to the influence of those about him when he signed the instruments; that the Christian Catholic Church is an unincorporated voluntary association of individuals; that its head is Dowie and Speicher is next in authority.

The bill then charges that neither of said documents purporting to be the last will and testament of Frederick Sutton or the codicil thereto, are executed in accordance with the statute of this State so as to make either of them effective as a will or codicil; that the alleged witnesses to said documents are neither of them competent; that they were agents and servants in the employ of Dowie and members or partners in the voluntary association, the Christian Catholic Church, and beneficiaries of a trust held by Dowie of the entire property and effects of the Christian Catholic Church, and as such beneficiaries were interested in the devise contained in the alleged will.

The bill prays that Dowie individually and as general overseer of the Christian Catholic Church, and John G. Speicher individually and as executor of the last will and testament and codicil of Frederick Sutton, deceased, may answer the bill; that the said instruments in writing and the probate thereof may be set aside and declared null and void and not the last will and testament of Frederick Sutton or the codicil thereto; that the estate of said Frederick Sutton may be distributed among his heirs according to law.

An answer was filed by Dowie and Speicher denying all the material allegations of said bill, and a replication made thereto by the complainants.

An order was entered by the Circuit Court on September 27, 1904, that certain issues be tried by a jury in accordance with the "Act in Regard to Wills." These issues were:

First. Is the writing in question purporting to be the last will and testament of Frederick Sutton, deceased, the last will and testament of said Frederick Sutton?

Second. The same question as to the codicil.

Third. Was Frederick Sutton, at the time of the execution and attestation of the said writing in question purporting to be the last will and testament of said Frederick Sutton, of sound mind and memory?

Fourth. The same question as to the codicil.

Fifth. Was there any undue influence exercised over the said Frederick Sutton that resulted in the making of said will?

Sixth. The same question as to the codicil.

On the same day a jury was impanelled, a trial of the issues was had before it, in accordance with the statute, and on October 1, 1904, the jury returned a verdict "that the instrument offered in evidence as the last will and testament of Frederick Sutton, the deceased, is not the will of said testator," and that "the codicil offered in evidence is not the codicil of said testator." Thereafter the proponents of the alleged will moved that said verdict be set aside and a new trial granted. This and the counter-motion of complainants for a decree in accordance with the verdict coming on to be heard together, the decree from which this appeal was taken as hereinbefore set forth, was rendered by the chancellor.

It is assigned as error that the court below erred in admitting improper evidence for the contestants over the objection of the proponents, in refusing to admit proper evidence offered by the proponents, in refusing to give and in modifying proper instructions requested by the propo-

nents, and in giving improper instructions requested by contestants.

It is also assigned as error that the verdict of the jury is contrary to the law and to the evidence and the weight thereof, and that the court erred in denying the motion of the proponents to set aside the said verdict and grant a new trial, and erred in refusing, on the motion for a new trial, to hear the proponents upon the question whether or not the verdict was contrary to the law or was contrary to the weight of the evidence.

It is alleged also that the findings of the decree that the execution of the alleged will and codicil were procured by the undue influence of Speicher, and that Sutton at the time of their execution was not of "sound and disposing mind and memory", are unsupported by the verdict, the evidence and the law, and that said decree is unsupported by the verdict.

In the written motion for a new trial, the overruling of which is assigned for error, there were set up as reasons for granting it certain things not mentioned in the assignments of error, but which by the denial of said motion are before the court in this appeal, namely, that the verdict was manifestly the result of passion and prejudice, and that there was misconduct on the part of the jurors during the progress af the trial, in that certain jurors discussed at length the merits of the controversy with other members of the jury, expressed their opinions publicly with reference to what the verdict should be, misrepresented the proponent Dowie to other jurors by pretending to give testimony drawn from their own knowledge concerning matters not in issue before them, publicly admitted that the verdict had been decided upon before the instructions were delivered to the jury by the court, and otherwise showed themselves prejudiced against the proponents. To support these allegations of misconduct on the part of the jurors, the proponents produced and read to the court on the hearing of the motion for a new trial two affidavits of third parties as to certain alleged occurrences and statements, and the contest-

ants read counter-affidavits of two of the jurors mentioned in said original affidavits.

Cross-errors were assigned on the record by John Benniworth Sutton, George Sutton and Charles Sutton, appellees, as follows: That the court erred in overruling objections of appellees to the competency of the subscribing witnesses to the alleged will and codicil, and erred in overruling objections of appellees to the competency as witnesses of members of the Christian Catholic Church, who were called by appellants as witnesses upon the trial before the jury in the contest of the alleged will and codicil.

V. V. Barnes, Charles E. Lauder and P. R. Barnes, for appellants.

Jule F. Brower, Samuel B. King and Bulkley, Gray & More, for appellees.

Mr. Justice Brown delivered the opinion of the court.

A question of parties is raised by the argument of the appellants, which we will first dispose of. Because The Christian Catholic Church, an unincorporated voluntary association, numbering approximately 250,000 members scattered throughout the world, was not made a party to the bill, this court, it is insisted, must reverse the decree and remand the cause. To the objection made by appellees that to make all the members parties by name was impracticable and that as they were so very numerous it was enough, under familiar rules, to make John Alexander Dowie defendant as general overseer of the Christian Catholic Church, thus representing the body of its members, in addition to making him a defendant individually, the appellants argue that this is a very different thing from suing the Christian Catholic Church and obtaining service on the church by delivering a copy of the writ to John Alexander Dowie, overseer thereof. This is not to the point, because the rule which allows one or more representatives of a class to stand for all is not based on any analogy to the statutory methods of service of legal process on corporations, but on

entirely different and less technical rules adopted to prevent a failure of justice. But we do not think that either the Christian Catholic Church *eo nomine* or its membership, represented by one or more of its official leaders, was a necessary party to this bill. The instruments involved did not leave property to the Christian Catholic Church, but left it to John Alexander Dowie (described as the general overseer of that church), and to his successor or successors, as general overseer, absolutely and forever. There is no trust declared in this, unless the limitation to the successor, instead of to the heirs and representatives, makes such a trust. "In order," the bequeathing clause goes on to say, "that my said estate and effects, etc., may be more effectively used for the good and furtherance of the Christian Catholic Church, I hereby authorize said John Alex. Dowie, his successor or successors, to sell, convey, pledge, mortgage, invest and reinvest, use and *expend* said estate and effects, etc., proceeds and income thereof, in such a way and manner as he or they may deem best." This clause does not seem to declare a trust in any positive terms; but confirms the previous outright gift by professedly removing any possible doubt as to the full power of disposal and administration of the property bequeathed, without the interference or dictation of the church as an organization, or of any member thereof, in or out of office. Therefore, it seems that no other person or party than Dowie himself, so far as the interest in the property bequeathed is concerned, is necessary to a full disposition of the rights involved.

Still another objection made to appellants' position as to this question, we deem valid. It is that it was taken too late. The point was not made by them in the court below, it was not incorporated in the motion for a new trial, it is not even mentioned here among the assignments of error.

It is argued by counsel for appellants that it is a matter on which an appellate court should act whenever its attention is called to it. We think the cases cited to this effect go no farther than to state the salutary rule that in the interests of justice any court, *nisi prius*, intermediate or

ultimate, will, if necessary, stop proceedings until parties whose rights are to be disposed of have had an opportunity to be heard. But in this case, with Dr. Dowie, the sole devisee, and Mr. Speicher, the executor, parties defendant to the bill, any other members of the Christian Catholic Church, even if they could be said to be proper parties, which we do not believe, would certainly be "formal, not indispensable parties," and it is too late to raise the objection in this court. American Bible Society v. Price, 115 Ill. 623.

Assignments of cross-errors by certain of the appellees challenge the competency of the subscribing witnesses to the instruments involved in this litigation, and the competency of several witnesses called by the proponents to testify before the jury, by the same proposition urged by appellants to show a lack of proper parties to the bill, namely, that all members of the Christian Catholic Church are pecuniarily interested in sustaining the will. We do not consider the argument valid in either case. A devise or legacy, even independently of the eighth section of our Statute of Wills, must, we think, be beneficial and direct to disqualify a subscribing witness, or to render a person called as a witness in the trial of the contest so "interested in the event of the suit" as to be incompetent.

We have already said that in our opinion it would be, under the will in question here, Dr. Dowie alone, (and, as to anything left by him, his successor as general overseer) who could enjoy or enforce in any manner the benefit of the bequests. The cross-errors are therefore not well assigned.

We have felt ourselves called on, therefore, to consider this case on its merits. As our conclusions are based on the evidence in the record, however, we think it desirable to pass first on the questions raised on the admissibility of certain evidence especially bearing on the issue which we deem the most material in the case, and on which we have decided it—the want of testamentary capacity of Frederick Sutton at the time he signed the alleged will and codicil.

One of the most important of the objections made to the admission of evidence proposed by the contestants was the one taken to the admission of a letter in Frederick Sutton's handwriting and signed by him, to the contents of which we shall hereafter allude. It purported to be dated " Cape Town, 29th Oct., '91," and began " Dear Nell." By its contents it showed that it was addressed to his sister. He had but one sister, Ellen Edridge by name, and the letter was plainly addressed to her. It was introduced by counsel representing her and the other contestants, in the course of the cross-examination of a medical witness who had known and treated Frederick Sutton. The objection made to it by appellants is not so much that it was not identified as sent, as that the date, " Oct. 29th, '91 " is evidence that it was written too long before the matters in issue to be material. There is no reason whatever for any such inference. The figures at the top of the letter, while affording a presumption of the date, by no means make it conclusive. When, as in this case, it is plain to a man of common sense that the letter was written at Cape Town while a war was going on, by a man who was in Cape Town, on the journey he speaks of in the letter, about October 29, 1901, it becomes also plain to him that the date '91 was a clerical error for 1901. There was no error in admitting the letter in evidence.

It is also claimed that there was improper evidence admitted of the opinion of various witnesses that there was no foundation for the belief entertained and the charges made by Frederick Sutton that John Sutton, his brother, had stolen or poisoned his sheep. Apart from the fact that in but one of the several instances of the admission of this testimony was any objection made or exception taken to it, we do not think it immaterial or incompetent. It does not stand on the ordinary footing of a matter of opinion. A most important and material matter to be determined in this case was the existence or non-existence of insane and fixed delusions on the part of Frederick Sutton, rendering him hostile to his brother and unable to recognize what are termed " the natural claims " of kinship.

· The testimony of Robert Foster, the hotel-keeper at
Thornbury, where Frederick and John Sutton lived, well
illustrates the character of all this testimony: "Fred
Sutton was always peculiar and fancied everybody was try-
ing to get at him, but he never accused anybody of any-
thing different except his brother, John. He told me
repeatedly that his brother John was stealing his stud sheep
and was getting prizes with them. He repeatedly told me
that his brother John was stealing his sheep. I often tried
to talk him out of it. He used to go away when I was
arguing with him, but the next time I saw him he would
bring up the same thing again. I could not turn him off
the subject. When John Sutton was sending away sheep
by train, I have seen Fred Sutton looking through the
trucks, examining the sheep. I have heard them order
him off the truck. So far as I know there was no ground
for this accusation against his brother John. I have
known John Sutton for nearly forty years. I have never
known any wrong of him. * * * I frequently saw
Frederick Sutton at the railway station and frequently had
conversations with him. The conversations generally ended
in the harping on the one string of John stealing his sheep."

It is plain that the testimony concerning the constant
"harping" on the alleged stealing was competent in con-
nection with testimony concerning the character and repu-
tation of the brother accused, as tending to show an insane
delusion. We do not think that the court erred in letting
go to the jury, therefore, the various statements complained
of tending to show the baselessness of the charges. But
in any event the single instance of which complaint was
made at the time could not of itself constitute reversible
error—the numerous other statements to the same effect
being considered. The admission of these last, no objection
being made nor exception taken, cannot now, we think, be
successfully complained of in any event.

The statute provides that an issue at law for a jury shall
be made up in these cases, and the Supreme Court has held
that the verdict stands not as an advisory verdict in chan-

cery, but on the same footing as a verdict in a common-law case when it is sought to set it aside. The testimony is heard as in a suit at law, and does not come under the reasoning in Smith v. Newland, 40 Ill. 100, cited by the appellants to show that no exceptions are needed, because in chancery "the entire proceedings are matters of record." Even if no formal exceptions are necessary, as the learned judge then presiding in the Appellate Court of the Third District held in Camp. v. Shaw, 52 Ill. App. 241, the objection to the testimony certainly ought to be brought to the attention of the trial court when offered, not for the first time raised on appeal.

The inference from the whole testimony is that it was practically admitted by proponents that the accusations of Frederick Sutton against his brother were baseless, whatever may have been their origin, or whether or not they showed insanity or delusion.

Nor do the other less important rulings on the testimony offered and received, or those on testimony offered and rejected, give us any reason for thinking the verdict should be set aside. They were correct or entirely unimportant.

Examining this cause then on its merits, we have found that the evidence which the record contains leaves no doubt whatever on our minds of the want of testamentary capacity on the part of the testator at the time that he made the will and codicil in question. That evidence furnishes not only a sufficient basis to justify the verdict which we are asked to overturn, but it establishes, we think, beyond a reasonable doubt that Frederick Sutton was on March 22, 1902, and March 25, 1902, and had been, for several years, of fundamentally unsound mind, subject to insane delusions of a character which affected his whole mental constitution. The manner in which fixed delusions fasten themselves upon a diseased mind, vary, grow and develop until they underlie and enter into every action of a man's life, is a very interesting branch of psychology. A thing always to be borne in mind in legal investigations concerning delusions of this nature is that the delusions

are the offspring of the diseased mind, not the diseased mind the effect of the delusions. It is sometimes apparently thought that if the fixed idea which constitutes an insane delusion could be overcome by argument to the person so under the obsession of the idea, his mind would be left healthful and sane. This is a fallacy. If a paranoiac, with ideas of persecution, could be by any means moved from the one insane delusion which manifests his mental disease, it would only be to prove it by another in the same stage of development. In the case of Frederick Sutton, the paranoia which was proven was characteristic and progressive. He was, as he conceived, the constant object of persecution from all women. They were following him with potions and powders to be administered to him and sprinkled upon his body. In most preposterous and almost inconceivably absurd ways he would act on this delusion, believing fixedly, as one of the witnesses phrases it, "that all women were banded together in one sect or society to poison or destroy all men who had lived to his time of life unmarried." The evidence is overwhelming on this point. It would serve no useful purpose for us to rehearse or abstract it here. His mental disease had begun to be evidenced by this delusion several years before 1901, but in that year, being then fifty-seven or fifty-eight years old, led apparently by the great fear of the women of New Zealand, he sold his property there, sought out a ship without a stewardess or other woman on board, and left for England. At Cape Town he wrote this letter, as before stated addressed evidently to his sister, with whom he had no real cause of displeasure or anger:

"CAPE TOWN, 29th Oct., '91.

DEAR NELL: I am stuck at Capetown owing to war regulations. They ordered me off the ship four minutes before she started and told me to be quick. I am so much persecuted with the women it is questionable if my constitution will stand until I get through this bother and the journey by ships to England. If this murder by inches continues it will not be a long job now. What I write you more particularly for is to let you know I consider you as

one of my murderers.   There are, I should say, hundreds of them that have practiced this villainy upon me, that is cruelly and painfully killing me.   If you want to go to hell, you will get there unless you repent and get God's forgiveness, for, if you did not drug me yourself, you had a guilty knowledge.   You insult God by your villainy; by your actions you say he did not know to make a man. Although you acted the drugging fiend to your own brother when he was at his wits' end to you where to turn to live; it is not my wish for you to go to hell, but I hope you will forsake all sins and accept God's full salvation.   My stomach is about poisoned to incapability and kidneys affected. I don't expect ever to see you again.   Your husband's stomach was all off-duty I suppose.   He has had his share of woman's villainy.   May God forgive you.   If you know how hard it is to be gradually poisoned by inches you would count death a happy release.   Goodbye.   Get rid of all your sin at our loving Savior's feet.

Your poor three-quarters murdered brother,

F. SUTTON.

Tell the set of murdering knights that the job is about completed.   I get weaker day by day, and can scarcely eat anything."

As we have before noted, the date was really October 29, 1901, scarcely a month before he arrived at the Hospice in Chicago, under the control of Dr. Dowie and the Christian Catholic Church, and five months before he executed the instruments in litigation.   It furnishes a very significant picture of the state of his mind at this time, and shows that because she was a woman he considered his sister as in league with his persecutors and would-be murderers.   She was what the courts have called "a natural object of his bounty."   Can it be said with plausibility even, that Sutton's insane delusion concerning women, thus manifested, did not prevent him from correctly appreciating that fact, and did not presumably enter into the expression of his alleged will?

But the unsoundness of Sutton's mind, the fact that he was a paranoiac with "the delusion of persecution" (see Wharton & Stille's Medical Jurisprudence, Vol. 1, Sec. 1024), was demonstrated during several years before he left New Zealand in another way almost equally as con-

clusive to us. He is shown to have had a fixed idea, based
on no evidence, and entirely without foundation in the
character or habits of the person accused, that his brother,
John B. Sutton, not only the companion of his boyhood,
but his partner for years in his early manhood, and then
his next neighbor, was continually stealing and poisoning
his sheep. The arguments of his neighbors and friends who
knew both parties well, the advice of physicians and law-
yers, the report of police officials who had made investiga-
tion of the matter, were of no avail whatever to shake this
delusion. Their only effect was to excite him and make
more manifest the fixity of the delusion. The police officer
felt justified in reporting to the police commissioner that
the man was suffering from hallucinations, and that there
was no foundation for the charge made. While this par-
ticular manifestation of his mental unsoundness, his distrust
of his nearest relatives, and his belief that he was perse-
cuted by them, was better illustrated by his mental atti-
tude towards his brother John, there is evidence that it ex-
tended to his brother George and his deceased brother
Tom; and lacked reason in their case as much.

It seems to us that Wharton & Stille, Vol. 1, Sec. 1045,
touch the heart of such a situation when they say: "As
to tracing the act of a paranoiac directly to his delusion, it
may or may not be possible, but  *  *  *  a paranoiac
with ideas of persecution may build up a most complete
system of delusions which control his conduct by hidden
springs of action, and which he may not disclose. Where is
the psychiatrist with the slightest personal knowledge of
the insane who will venture to proclaim that he can read
unerringly the mental processes in every case?  *  *  *
In other words, the disturbing action of a systematized de-
lusion may extend to all the mental functions and control
conduct in the most inscrutable way."

It is not necessary to advert to the matters in the record
showing eccentricities and peculiarities of Frederick Sutton
which might tend to confirm a belief in his mental un-
soundness. No such confirmation seems to us needed, in

view of the establishment by convincing evidence of the two paranoiac systematized delusions which we have discussed.

It would be useless also, in our view, to discuss at length the argument so vigorously insisted on by appellants' counsel, that Sutton was competent to transact ordinary business, that the very witnesses who testified to his delusions showed they so regarded him by making contracts with him, and that that competency proves testamentary capacity under the law of this State. The question before us is not as to his contractual ability; and if it were, the fact that witnesses who testified to his delusions did business with him, would neither necessarily establish the ability nor stultify the testimony.

That which we are called on to decide, however, is whether or not he had testamentary capacity under the law of Illinois, and it is not, in our opinion, more true as a matter of law that every contract of a person without testamentary capacity is necessarily void or voidable, than that as a matter of law "a person because incapable of transacting ordinary business is *therefore* incapable of making testamentary disposition of his estate," which the Supreme Court expressly denied in Craig v. Southard, 148 Ill. 37, and Sinnet v. Bowman, 151 Ill. 146.

The two matters are distinct and independent to a certain extent. To make a valid will, one need not "retain all his vigor of mind and memory," but his mind and memory must be sufficiently sound to enable him to know and understand *the business in which he was engaged in executing the will*, judging his competency of mind by the nature of the act to be done *and a consideration of all the circumstances of the case.* Trish v. Newell, 62 Ill. 196, and Graybeal v. Gardner, 146 Ill. 345.

And it is the purport of what is said in Hutchinson v. Hutchinson, 152 Ill. 347, quoted by appellants' counsel, that testamentary capacity, even when the mind is not perfectly balanced, consists of "capacity to transact ordinary business plus *ability to comprehend objects and subjects of*

*bounty, and freedom from insane delusions especially affect-ing the power of disposition."*

To the same general effect are American Bible Society v. Price, 115 Ill. 623, and Orchardson v. Cofield, 171 Ill. 14.

In this case we think that the evidence clearly proves that Frederick Sutton left New Zealand and arrived at Cape Town in South Africa in 1901 under the influence of insane delusions which showed mental disease and unsoundness and which, moreover, directly affected his ability to properly appreciate the claims of natural objects of his bounty and his probable action in disposing of his property by will.

Appellants say, however, that there is "positive testimony upon the part of many witnesses that leave the irresistible conclusion" that Sutton's testamentary capacity "was much improved" between the day that he sold out in New Zealand and the days on which he made the will and codicil. This rests, however, on the testimony of proponents' witnesses connected with Zion Hospice, and the assumption that the letter to "Dear Nell" from Cape Town was not written in 1901, on his way from New Zealand. We have already indicated that we believe that it is reasonably certain that this letter was written during the latter part of October, 1901, and that it shows the existence of his mental unsoundness and of one at least of the delusions which affected his testamentary capacity. Less than three months afterward he made the instruments in question. The evidence, we think, shows that his brain was diseased, that he was a victim of habitual, chronic and continuous insanity as late as October, 1901. When such a condition has existed prior to the making of a will, the law presumes that it has continued, and the burden of proof is on him who alleges that the testator has recovered his mind. Wharton & Stille's Medical Jurisprudence, Vol. 1, section 1171; Langdon v. The People, 133 Ill. 382, 405.

The evidence of Sutton's mental condition after his arrival in Chicago about December 1, 1901, is very far from sustaining this burden. It is true that the two witnesses

to the will, Mr. Ruby and Mr. Cotton, Mr. Taylor, who drew it, and Mr. Barnard, Mr. Peckham and Mr. Sloan, business managers of the interests of the Christian Catholic Church, gave testimony tending to show Sutton's capacity to understand and attend to ordinary financial business while he was in Chicago, and gave their opinion, based, however, on no very extended observation, that he was during this time sane. But all this really tended to prove was that he did not show to them in his conversation and transactions the systematized delusions from which it was plain he had been suffering for years, and that, as Mr. Ruby explained, he showed "no violent outward manifestations of insanity."

The testimony of Miss Cummings, who nursed Sutton at the Hospice during his last illness, is more to the point, for she says she saw him in meetings where women were present; that he talked freely with her and that she had seen him talk with other women, exhibiting no aversion to them; that she understood " from what he said that it was a certain class of women that he objected to."

But there is, even with this, no proof in this testimony that the progressive insanity of years had passed away. On the other hand it appears by the testimony of a witness produced by the proponents, Mr. Kessler, that, although charged regular rates for his board at the Hospice, Sutton bought things to eat outside the house and did his own cooking, and Kessler testifies that he may have said that " Mr. Sutton, refusing to eat the food that was prepared and demanding that he have only what was prepared by himself, seemed very foolish;" and that, why he does not know, Sutton shortly before his death sat for a photograph and after removing his clothing had his picture taken in an almost nude state.

All these witnesses were connected with the institutions and church which would benefit by the establishment of the will, and without discrediting their testimony on that account, it is to be assumed that it is not colored by any hostility to those institutions and that church.

Miss Cummings' testimony shows that when the assem-

bly room at the Hospice was too warm for the rest of the people, Sutton would sit by the heated steam radiator with an overcoat on—not a very remarkable thing in itself perhaps in one who came from New Zealand to a much colder climate—but taking on some significance as being in the line of his proven standing delusions concerning the poisonous powders which women were endeavoring to get upon his body.

The only other witness produced on either side who testified as to Sutton's condition in Chicago, was the agent of a brokerage house who did business with him in the transfer of funds. While saying nothing particularly important, this witness testified that Sutton talked incoherently to him, and said that "all the people were trying to rob him," and that in witness' opinion he was insane. As it is admitted that because Sutton's business was not desired an unusually high rate of exchange was charged, this testimony has not much value, but Sutton's continued idea of persecution by stealing from him is worth notice.

The conclusion which we have reached concerning the testamentary capacity of Frederick Sutton when he made the alleged will and codicil in question, makes entirely superfluous any discussion by us of the further ground of the contest made on them—that they were the product of undue influence on the part of officers and agents of the Christian Catholic Church. The argument is made that these officers stood in such confidential relationship, such a relation of dominancy to dependency, that in view of the fact that the will was drawn and its execution procured by representatives and agents of the church benefited by its dispositions, a presumption of undue influence arises therefrom as a matter of law. Further, it is urged that the evidence shows actual domination of the testator's mind, and that this is especially true because less evidence is required to invalidate a will on the ground of undue influence when the mind of the testator is shown to be in any way unsound or disordered, than in other cases.

We do not pass on the propositions of law here involved,

nor on the facts, further than to say that if the mind of the testator had not been proven to be in an abnormal state when he arrived in Chicago and when he made his alleged will and codicil, we should not have found in the fact that he was in the company of and cared for by the officers and agents of the church, any reason for holding his will and codicil the result of their undue influence. He seems to have sought them voluntarily—led undoubtedly by former religious associations and traditions in New Zealand—and had he been of capacity to transact ordinary business, ability to comprehend the objects and subjects of his bounty, and free from insane delusions especially likely to affect his testamentary disposition, the fact that he was weak in physical health and left his property away from his relatives to a stranger for what he deemed religious uses, would not have rendered invalid his will. But as he was without testamentary capacity as tried by the tests described, the verdict of the jury that the instruments offered in evidence are not the will and codicil of Sutton was plainly correct, and the ordering part of the decree vacating their probate and declaring them void being proper and justified, we should affirm it without regard to the unnecessary finding, on which we do not pass, that the execution of the documents in question was procured by the undue influence of the defendant, John G. Speicher.

Were the case to our mind a close one, on which the jury might without difficulty have found either way, we should be inclined to place more importance on the charges made by appellants that members of the jury showed prejudice against the proponents of the will, and that their questions should have been rebuked by the court. We do not approve of the disposition shown by the record on the part of some of the jurymen to criticise during the trial the methods and practices of Dr. Dowie and his companions; but we cannot see, in view of the evidence, how the verdict could have been different. We do not think, in any event, there is anything so pronounced in the conduct of jurymen, in the absence of any request for the action of the court at the

time, as to justify our interference with the verdict. Nor do we see in the affidavit of Chenowith ground for such interference. Taken as true, it shows indiscretion rather than misconduct on the part of jurymen.

We have considered the instructions complained of one by one, and when viewed together and in connection with our opinion on the evidence to which they were applied, we find in them no error which should lead to a reversal of this decree. Detailed discussion of them is therefore unnecessary.

Nor do we find error in the judgment for costs against the executor named in the alleged will unsuccessfully defending this cause, even though we do not pass on the finding that his undue influence secured the execution of the same. Such judgment seems to be justified by the decisions. Shaw v. Moderwell, 104 Ill. 64, 70; Moyer v. Swygart, 125 Ill. 262, 276; Hesterberg v. Clark, 166 Ill. 241, 244.

The decree of the Circuit Court is affirmed.

*Affirmed.*